# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

United Steel, Paper and Forestry, Rubber,
Manufacturing, Energy, Allied Industrial
and Service Workers International Union,
AFL-CIO·CLC and its Local 4-0902,

       Plaintiff

       v.

Rand-Whitney Container, LLC,

       Defendant.

February 21, 2017

## COMPLAINT

The Plaintiff, the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO·CLC (the "USW" or the "Union") submits the following complaint against Rand-Whitney Container LLC ("Company").

1. Plaintiff brings this action to enforce the collectively-bargained rights of members of United Steelworkers Local 4-0902 to vacation benefits under a collective bargaining agreement between the parties.

2. In the alternative, this is an action to obtain specific performance of an agreement between the parties to resolve disputes through the agreed-upon method of arbitration. The relevant collective bargaining agreement between the Company and the Union contains a grievance and arbitration procedure which culminates in submission of disputes to a neutral arbitrator for binding resolution. The Company has breached this agreement by refusing to proceed with arbitration of a grievance filed by the Union. This suit seeks to compel arbitration.

I.    **JURISDICTION & VENUE**

3.     This court has jurisdiction over this matter pursuant to Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. §185.

4.     Plaintiff USW is a labor organization representing employees in industries affecting commerce within the meaning of the Labor Management Relations Act of 1947, as amended, 29 U.S.C.  §§ 142, 152 and 185, and provides such representation within the State of Connecticut and in the geographic area within this Court's jurisdiction.

5.     Defendant Company is an employer authorized to do business in the State of Connecticut and is engaged in an industry affecting commerce as defined in the Labor Management Relations Act of 1947, as amended, 29 U.S.C.  §§ 142, 152, 185.

6.     Plaintiff USW has, for all times material hereto, been the recognized bargaining representative of the bargaining unit employees at the Company's Newtown, Connecticut, facility.

II.   **FACTS**

7.     Since 1970, the USW and the Company have been parties to a series of collective bargaining agreements. Relevant to this case, a collective bargaining agreement between the USW and the Company with effective dates from February 1, 2012 through February 1, 2015, ("2012 CBA") governed the terms and conditions of employment for a bargaining unit of production and maintenance employees and truck drivers at the Company's corrugated container plant in Newtown, Connecticut. A true and correct copy of the 2012 CBA is attached hereto as Exhibit A.  In 2015, a successor collective bargaining agreement with effective dates from February 1, 2015 through February 1, 2018, ("2015 CBA") was bargained and executed by the parties. A true and correct copy of the 2015 CBA is attached hereto as Exhibit B.

8.      The 2012 CBA is a contract between a labor organization and an employer that may be enforced under Section 301 of the LMRA, 29 U.S.C. §185.

9.      Article XII of the 2012 CBA, entitled "Adjustment of Grievances," provides a procedure for the presentation, adjustment, and settlement of grievances, and broadly defines a grievance as any matter over which "an employee feels aggrieved."

10.      Article XIII of the 2012 CBA, entitled "Arbitration," provides that if settlement of a grievance is not reached through operation of the grievance steps, "the matter shall be referred to an arbitrator mutually selected from a list supplied by the American Arbitration Association" and that the decision of the arbitrator "shall be final and binding on the Company, the Union and the employees."

11.      Article V of the 2012 CBA sets forth bargaining unit employees' entitlement to vacation and the method of vacation accrual under the contract.

12.      Under Article V of the 2012 CBA, the vacation year is established as extending from January 1st to December 31st.  Article V contains two grids (one for employees hired prior to February 1, 1997 and one for employees hired on or after February 1, 1997) which set forth employees' annual eligibility for vacation pay based on their length of service and as a percentage of their earnings in the previous 52-week period.

13.      Specifically, Article V of the 2012 CBA provides that "For the first vacation of any employee, vacation pay will be based on the fifty-two (52) weeks preceding the employee's first anniversary. The employee will then be eligible for their next week of vacation during the following year after the employee has worked 1,040 hours from the date of his or her first anniversary. Subsequent weeks of vacation will be earned as follows: The employee shall have worked at least 1,040 hours, including overtime hours, for the Company during the twelve (12)

calendar months from January 1 through December 31 immediately prior to the vacation period. […]" Thus, under the vacation policy embodied in the 2012 CBA, employees earn vacation in the year prior to the year in which they are eligible to use their vacation.

14.    Under the successor agreement, the 2015 CBA, the 2012 vacation policy was abandoned in favor of a new Enhanced Paid Time Off ("PTO") policy.

15.    Article V of the 2015 CBA provides that "PTO will be allotted on January 1 of each year following the employee's anniversary and vest at the rate of 1/12[th] of the PTO allocation per month."

16.    Affected employees' vacation earned under the 2012 CBA in 2014 was payable in 2015.  The Company, however, failed to pay the 2014 earned vacation in 2015 and instead provided employees only with the 2015 PTO that they were eligible for under the 2015 CBA.

17.    On or about February 11, 2016, the Union became aware that the Company was planning to sell the Newtown facility to Cascades Holding US Inc. d/b/a/ Cascades Containerboard Packaging ("Cascades").

18.    On or about April 18, 2016, Local Union 4-0902 President Randall Mahoney submitted a written grievance to the Company stating, in part, that as a result of the change "all employees should have received a check for their vacation that they earned in 2014. This should have been paid by December 31, 2015. As of April 18, 2016 we have not received our vacation pay." A true and correct copy of the April 18, 2016, grievance letter is attached hereto as Exhibit C.

19.    By letter dated April 26, 2016, the Company's HR Manager, Marisol Jimenez, provided the following response to the Union's grievance: "As you know, all disputes arising under the collective bargaining agreement are to be handled through the grievance and

arbitration provision(s) set forth in Article XII and Article XIII [of the CBA]. Since you failed to submit a grievance on this issue as required by Article XII, the Company denies your grievance both on substantive and procedural grounds." A true and correct copy of the Company's April 26, 2016 grievance response is attached hereto as Exhibit D.

20.     In anticipation of the sale of the Company to Norampac, the Company and the Union entered into effects bargaining to address the impact of the sale on bargaining unit employees and to resolve outstanding issues between the parties with the goal of arriving at a mutually-acceptable shutdown agreement.

21.     On May 10, 2016, USW Staff Representative Mike Higgins provided the Company's attorney, Mark Reiss, with a copy of the Union's effects bargaining proposal. The Union's offer included the proposal that the Company make employees whole for vacation time that they had earned in 2014 under the 2012 CBA but which the Company failed to pay them in 2015.

22.     On May 11, 2016, the Company's Director of Compensation and Benefits, Kristen Schersten, provided the Union with information regarding, among other things, a comparison of the 2015 vesting schedule for the Enhanced PTO under the 2015 CBA with the vacation vesting schedule under the 2012 CBA.

23.     On May 12, 2016, the parties participated in two bargaining sessions via telephone with Mr. Reiss representing the Company and Mr. Higgins and USW Sub-District Assistant to the Director, Del Vitale, representing the Union. During the bargaining session which began at or about 12:50PM, Mr. Vitale proposed that the Company pay 100% of the 2014 accrued vacation pay to make employees whole. During a follow-up bargaining call which

began on or about 2:45 PM, Mr. Reiss countered the Union's proposal, offering to pay 50% of the 2014 accrued vacation.

24.     On May 19, 2016, the Company provided the Union with documentation regarding the 2014 accrual rate under the 2012 CBA's Vacation Article. Mr. Higgins confirmed with Mr. Reiss later that day by telephone that the Union accepted the Company's 50% vacation pay proposal.

25.     On June 1, 2016, the sale of Rand-Whitney's assets to Cascades was finalized and employees whose terms and conditions of employment were covered by the 2015 CBA became employees of Cascades.

26.     On August 30, 2016, Mr. Reiss provided a draft of the shutdown agreement to Mr. Higgins by email. The Company's draft did not include the agreed-upon payment to employees of 50% of their accrued 2014 vacation.

27.     On September 7, 2016, Mr. Higgins contacted Mr. Reiss by email stating his concern over the absence of the parties' agreement reached on the 2014 accrued vacation pay in the Company's draft of the shutdown agreement. Mr. Higgins and Mr. Reiss spoke by telephone shortly thereafter and Mr. Reiss stated that the Company was not going to pay any of the 2014 accrued vacation.

28.     The Company has refused to pay the 2014 accrued vacation and has refused to arbitrate.

29.     The Union and the employees it represents are without adequate remedy at law and will continue to suffer immediate irreparable injury unless the Company is ordered to comply with the 2012 CBA and make eligible employees whole for earned 2014 vacation or, in

the alternative, to comply with the arbitration provisions of the CBA and arbitrate the vacation

pay grievance.

## COUNT I.   <u>VIOLATION OF LABOR AGREEMENT ACTIONABLE UNDER SECTION301 OF THE LMRA</u>

30.     The Union repeats the foregoing allegations as if fully set forth herein.

31.     The 2014 vacation pay is a benefit provided to eligible employees provided to by

a collective bargaining agreement between the Company and the Union.  Under the 2012 CBA,

eligible employees have the right to receive from the Company the full value of their accrued

vacation benefit.  The Company's failure to pay employees these benefits infringes upon those

rights and violates the 2012 CBA.

32.     By the conduct described in this Complaint, Defendant is violating its

collectively-bargained obligation to provide accrued vacation pay to eligible employees, and

Defendant's conduct is actionable under Section 301 of the LMRA, 29 USC § 185(a).

## COUNT II.   <u>SUIT TO COMPEL ARBITRATION</u>

33.     The Union repeats the foregoing allegations as if fully set forth herein.

34.     The Company is in violation of its obligation under the collective bargaining

agreement to arbitrate the dispute concerning payment of accrued 2014 vacation pay.

35.     Where a collective bargaining agreement contains an arbitration clause, there is a

presumption of arbitrability and any doubts as to whether a grievance is covered by an arbitration

clause must be resolved in favor of coverage.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiff USW, prays that this Court:

A.   Declare that Defendant's failure to pay employees their 2014 vacation benefit is a violation of its obligations under the 2012 CBA;

B.   Order Defendant to perform its contractual and statutory obligations under the labor agreement;

C.   In the alternative, enter a judgment ordering the company to arbitrate the aforementioned grievance.

D.   Provide Plaintiff with attorneys' fees, pre-judgment interest and all costs of suit; and

E.   Issue any other relief as may be just and proper.

RESPECTFULLY SUBMITTED,

THE PLAINTIFF,

By:  _____/s/_____

Henry F. Murray  (ct17234)
Thomas W. Meiklejohn  (ct08755)
Livingston, Adler, Pulda, Meiklejohn
   & Kelly, P.C.
557 Prospect Avenue
Hartford, CT 06105-2922
(860) 233-9821
Fax (860) 232-7818
hfmurray@lapm.org
twmeiklejohn@lapm.org

8

# EXHIBIT A

# COLLECTIVE BARGAINING AGREEMENT

## -between-

## RAND-WHITNEY CONTAINER LLC
### Newtown, CT

## -and-

## UNITED STEELWORKERS
### AFL-CIO-CLC
### LOCAL UNION NO. 4-0902

**DATED:**          February 1, 2012
**TERMINATION:**    February 1, 2015

# TABLE OF CONTENTS

**ARTICLE**                                                    **PAGE NUMBER**

**ARTICLE I**          **RECOGNITION AND REPRESENTATION** .........................................1

    Section 1          Recognition ...............................................................................1
    Section 2          Membership ...............................................................................1
    Section 3          Dues Deduction.........................................................................2
    Section 4          Union Committee........................................................................2
    Section 5          Attendance at Union Conventions ............................................2
    Section 6          Local Elections..........................................................................2

**ARTICLE II**         **OPERATION OF THE BUSINESS** ...............................................3

**ARTICLE III**        **HOURS OF WORK AND OVERTIME**...........................................3

    Section 1          Work Day and Work Week...........................................................3
    Section 2          Opportunity for Overtime and Overtime Roster .........................4
    Section 3          Mandatory Overtime ..................................................................5
    Section 4          Rest Periods ..............................................................................6
    Section 5          Premium Pay ..............................................................................6
    Section 6          Rate for Temporary Assignments ..............................................7
    Section 7          Call Time ....................................................................................7
    Section 8          Report Time ................................................................................8
    Section 9          Non-Traditional Work Schedules ...............................................8

**ARTICLE IV**         **HOLIDAYS** ...................................................................................8

    Section 1          Recognized Holidays .................................................................8
    Section 2          Hours Worked On Holidays........................................................9
    Section 3          Holiday Allowance ..................................................................... 9

**ARTICLE V**          **VACATIONS**...............................................................................10

**ARTICLE VI**         **SENIORITY** ...............................................................................12

    Section 1          Types of Seniority ....................................................................12
    Section 2          Promotions and Demotions......................................................12
    Section 3          Lines of Progression.................................................................13
    Section 4          Transfers ..................................................................................13
    Section 5          Layoffs .....................................................................................14
    Section 6          Bumping....................................................................................14

Section 7       Probationary Employees ................................................................15

**ARTICLE VII**       **WAGES**................................................................................**15**

**ARTICLE VIII**       **FUNERAL LEAVE** ................................................................**16**

**ARTICLE IX**       **JURY LEAVE** ................................................................**17**

**ARTICLE X**       **CONTINUITY OF OPERATIONS**................................**17**

**ARTICLE XI**       **LEAVES OF ABSENCE** ................................................**18**

Section 1       General................................................................18
Section 2       Military Duty................................................................18

**ARTICLE XII**       **ADJUSTMENT OF GRIEVANCES**................................**18**

**ARTICLE XIII**       **ARBITRATION**................................................................**20**

**ARTICLE XIV**       **PENSION**................................................................**20**

**ARTICLE XV**       **GENERAL**................................................................**21**

Section 1       Bulletin Boards ................................................................21
Section 2       Non-Discrimination ................................................21
Section 3       Insurance ................................................................21
Section 4       Job Progression ................................................21
Section 5       Discharge and Termination ................................21
Section 6       Disciplinary Offenses................................................22
Section 7       Supervisors................................................................22
Section 8       Seniority List ................................................................22
Section 9       401(K) Plan ................................................................22
Section 10       Accident Reports................................................22
Section 11       Cafeteria 125 Plan ................................................22
Section 12       Summer Help ................................................................23
Section 13       Fulfillment Operation................................................23

**ARTICLE XVI**       **SEPARABILITY**................................................................**24**

**ARTICLE XVII**       **COMPLETENESS OF AGREEMENT**................................**24**

**ARTICLE XVIII**       **TERM OF AGREEMENT**................................................**24**

**EXHIBIT A**       **RATE SCHEDULE** ................................................................**26**

iii

**EXHIBIT B**      **INSURANCE**...................................................................................**28**

    Section 1      Insurance ...........................................................................28
                    Plan Design ........................................................................29
    Section 2      Sickness and Accident Insurance ......................................29
    Section 3      Life Insurance....................................................................29

**EXHIBIT C**      **LINES OF PROGRESSION**.............................................**30**

**EXHIBIT D**      **LINES OF PROGRESSION GUIDELINES FOR THE**
               **MAINTENANCE DEPARTMENT** .................................**31**

**EXHIBIT E**      **SUPPLEMENTAL MEMORANDUM OF AGREEMENT** ...............**33**

               **SAFETY SHOES** ........................................................**33**

               **SAFETY RULES AND PROCEDURE** ................................**34**

               **PLANT VEHICLES - (FORK TRUCKS)** ...........................**37**

               **EYE PROTECTION POLICY** .........................................**38**

               **PLANT RULES**..........................................................**40**

               **ATTENDANCE POLICY AND GUIDE** ..............................**40**

## COLLECTIVE BARGAINING AGREEMENT

This Agreement is by and between Rand-Whitney Container LLC, for its container plant located in Newtown, Connecticut (hereinafter called the "Company") and the United Steel, Paper and International Union, Forestry, Rubber, Manufacturing, Allied Industrial and Service Workers AFL-CIO-CLC, known in short as "United Steelworkers" or "USW," referred to hereinafter as the "Union," on behalf of itself and its Local Union No. 4-0902.

The parties to this Agreement desire to establish and maintain mutual understanding, mutual welfare, and cooperation that will promote to the fullest the safety of the employees, economy of operation, quality and quantity of output, cleanliness of plant and premises, and the protection of property, and it is recognized by this Agreement to be the duty of the Company, the employees and the Union to cooperate fully for the advancement of these conditions, looking toward a profitable operation.

## ARTICLE I          RECOGNITION AND REPRESENTATION

### Section 1     Recognition

The Company recognizes the Union for the purpose of collective bargaining as the exclusive representative of the unit comprising its production and maintenance employees and Truck Drivers at its corrugated container plant in Newtown, Connecticut, as certified by the National Labor Relations Board in its case No. 2-RC-15381, dated August 20, 1970. Office and clerical employees, timekeepers, professional employees, guards, watchmen and supervisors as defined in Section 2(II) of the Labor-Management Relations Act of 1947, as amended, are excluded. The Union agrees not to solicit nor accept such excluded employees for membership in the Union. The membership of Local 4-0902 will be composed exclusively of employees of the Company.

### Section 2     Membership

Subject to the provision of the Labor Management Relations Act, 1947, all new Employees and present employees (except for temporary employees who shall not be employed for more than ninety (90) days) who have heretofore become members of the Union shall, as a condition of employment, be members of the Union not later than the thirtieth (30th) calendar day following the beginning of such employment or the effective date of this Agreement, whichever shall be later, and as a further condition of employment, shall maintain such membership in good standing during the life of this Agreement.

1

**Section 3      Dues Deduction**

The Company will check off monthly dues or service charges, including, where applicable, initiation fees and assessments, each in amounts as designated by the Union's International Secretary-Treasurer, effective upon receipt of individually signed voluntary check off authorization cards. The Company shall, within ten (10) days, remit any and all amounts so deducted to the Union's International Secretary-Treasurer, Five Gateway Center, Pittsburgh, Pennsylvania 15222, with a completed summary of USW Form R-115 or its equivalent.

**Section 4      Union Committee**

The Union shall keep on file with the Plant Manager the name, addresses and telephone numbers of the duly elected and authorized members of the Union Bargaining Committee, Union Officers and Stewards. As far as the Company is concerned, the Union Bargaining Committee shall be limited to five (5) members. Whenever these members are required to attend a meeting called by the Company, or if called by the Union and approved by the Company, they shall be paid for time lost from scheduled work at the applicable rate, but never more than to the end of their respective shift. During contract negotiation time, the Union Bargaining Committee may consist of not more than five (5) members. The members of the Committee shall not be expected to work on any day in which they are engaged in contract negotiations with the Company.

**Section 5      Attendance at Union Conventions**

The Company shall permit employees to be absent from work in order to permit such employees to attend regularly scheduled International Union Conventions or regularly scheduled Regional International Union Meetings, and the officers of the Local Union and persons to be sworn in to the Local Union shall be permitted to attend the Local meetings when the same cannot be held outside of working hours. In all such instances, however, the employees involved shall be required to give at least three (3) days notice to the Company of such attendance in order to give the Company a reasonable opportunity to arrange for a replacement. In no event shall the attendance at any of such meetings be in such numbers as would interfere with production in the plant.

**Section 6      Local Elections**

Scheduling problems that conflict with the Union's local elections every two (2) years

will be discussed between the parties with the intent of arriving at a mutually convenient accommodation for each party.  The parties, however, recognize the importance of meeting customer requirements and the mutual accommodation as set forth above will, in all cases, insure that these requirements are met.

## ARTICLE II          OPERATION OF THE BUSINESS

Except as expressly limited by this Agreement, or any written amendments hereto, the Company retains the sole right to manage its business and direct the working force, including, but not limited to, the right to relocate, build or expand its plant, machines and equipment; to decide the products to be manufactured, the services to be rendered, the schedules of production, the process of manufacturing or assembling, together with all designing, engineering and control of raw materials, semi-manufactured and finished parts, which may be incorporated in the Company's products; to introduce technological innovations; to establish and enforce rules not in conflict with the Agreement; to create, change, combine or eliminate jobs; and to hire, transfer, layoff, promote, demote, discipline, suspend or discharge for cause.

This Agreement shall not limit the Company's right to expand or curtail its operations, to shut down completely, or to close, merge or consolidate departments, provided, however, that the Company shall give reasonable prior notice to the Union and shall negotiate with the Union the status of the employees affected by such actions.  The enumeration of the above management rights shall not be deemed to exclude other rights of the same general character not enumerated herein, and all rights held by the Company, except as expressly limited by other provisions of this Agreement. A violation of this Agreement claimed by the Union to exist as a result of the exercise of these rights by the Company shall be subject to the grievance and arbitration procedure of this Agreement.

## ARTICLE III         HOURS OF WORK AND OVERTIME

**Section 1      Work Day and Work Week**

a.      When working a traditional/standard work week schedule, the traditional/standard work day shall be eight (8) hours, and the traditional/standard work week shall be forty (40) hours. The traditional/standard work week shall begin at 7:00 a.m. day one (1) and end 7:00 a.m. the following day one (1).  When the daily or weekly work period is extended by the Company,

3

employees working such extended work periods will be eligible for premium pay as hereinafter provided.

      b.     When working a traditional/standard work week schedule, employees working in excess of eight (8) hours in a daily work period or in excess of forty (40) hours in a work week period will be paid time and one-half for the hours worked in excess of eight (8) hours on a daily basis or in excess of forty (40) hours on a weekly basis, whichever is greater, but not both, since overtime shall not be paid on overtime. During said schedule, double time will be paid after twelve (12) hours of work.

      c.     Traditional/standard shift hours:

          Shift 1:       7:00 a.m. - 3:00 p.m.

          Shift 2:       3:00 p.m. - 11:00 p.m.

          Shift 3:       11:00 p.m. - 7:00 a.m.

      d.     When working a traditional/standard work week schedule, hours worked between 11:00 p.m. the seventh (7th) day and 7:00 a.m. day one (1) will be considered day one (1) hours for purposes (straight time), for any third (3rd) shift employees that begin their work on the seventh (7th) day.

      e.     Employees shall be entitled to a twenty (20) minute paid lunch.

      f.     The time for the start and finish of an employee's shift may be changed by the Company as necessary to meet production and service requirements. Notification of changes will be given to the employee before the end of his or her regular schedule shift preceding the change or a minimum of twelve (12) hours prior to the start of the new shift.

      g.     An Employee is entitled to ten (10) hours off between shifts.

**Section 2     Opportunity for Overtime and Overtime Roster**

      a.     Opportunity for overtime will first be offered to the employee on the job. If an employee works four (4) hours in a job classification, the employee will be considered part of that job classification for purposes of overtime for that day.

      b.     If not obtained in this manner, overtime will next be offered to qualified employees, on shift, in the same classification in order of seniority. If not obtained through the above procedures, it will then be offered to the senior qualified member in the department with the exception of the department helper overtime.

4

For sixth (6th) day overtime, it will be offered to the senior qualified employee in the department, on shift, with the exception of department helper overtime.

    c.    Overtime will be paid at the job classification rate of employee or the rate of the job performed, whichever is higher.

    d.    When overtime is required in the classification of department helper in any department, it will, of course, be first offered to the helpers in the department and then, if we cannot obtain enough employees to fill our overtime needs, we will then offer the overtime opportunity to the other employees in that department on a roster basis designed to equalize the opportunity for overtime as department helpers. The roster will be maintained with the following notations:

        **W**    Employee accepted overtime and worked

        **R**    Refused overtime opportunity

        **N/A**    Not available

    e.    The maintaining of the roster will not mean that the Company will attempt to equalize the number of hours worked by all employees over a given period. The overtime roster will be posted daily.

    f.    If all employees refuse overtime, it is the responsibility of the employee on the job to accept it.

    g.    Employees will be notified that overtime is available one (1) hour before the end of their respective shift. However, if a situation arises that must be taken care of, the employee on the job will be expected to perform the work.

    h.    An employee who refuses overtime on three (3) consecutive occasions will be required to inform the Company, in writing, of their intent to accept future overtime opportunities. If the employee fails to notify the Company, that employee will be dropped from the overtime roster.

    i.    If it becomes necessary to cover an overtime assignment outside a department, available senior qualified employees will be asked to work such assignment. The seniority determination will be on the basis of plant seniority. If the vacancy is not filled as noted above, the available junior qualified employee will be required to work the overtime assignment.

**Section 3**    **Mandatory Overtime**

    a.    Union will be notified by fourth (4th) day, at the end of their shift, for sixth (6th) day work.

b.      Second and third shift employees will be notified one (1) hour before the end of their respective shift if they are to work mandatory overtime.

c.      When an employee completes his or her regular eight (8) hour shift and is unable to work overtime, the employee will not be marked as leaving early on his or her attendance card, if excused by a supervisor.

d.      The above does not apply in emergency situations such as: meeting first load requirements, machine breakdowns, heavy maintenance schedules, completion of corrugator schedules, and possibly absent machine crew members.

e.      No mandatory overtime in excess of twelve (12) hours per day.  Employees who desire to work over twelve (12) hours per day shall only be able to do so at the direction of the Company.

f.      In order to alleviate excessive overtime requirements on a particular machine, the Company will schedule other qualified crews to share the needed overtime work.

**Section 4      Rest Periods**

a.      The employees covered by this Agreement, shall be entitled to a ten (10) minutes rest period.

b.      The rest periods will be scheduled by the Company.  However, it is the Company's intent to schedule them as near the middle of each half a shift as practicable.

c.      When a nine (9) hour work shift is scheduled, employees so scheduled will receive a fifteen (15) minute rest period.

d.      If an employee is scheduled or required to work for ten (10) successive hours or more, the employee shall have a ten (10) minute rest period at the end of the first eight (8) hours, and the employee shall then have the same rest periods as the other employees working on the shift following his or her regular shift.  Other breaks in production time must be approved by the supervisor.

**Section 5      Premium Pay**

a.      When working a traditional/standard work week schedule, one and one-half the regular rates of pay will be paid for work performed on the sixth (6th) day, provided the employee has worked all the hours scheduled during the work week and double the regular rates of pay for work performed on the seventh (7th) day, provided, however, the employee has

6

worked all the hours scheduled during the work week and that if two (2) or more premium pay sections apply, the affected employee will be paid only under the one which will pay the employee the greatest amount and not under more than one (1) provision. For the purpose of determining eligibility for the sixth (6th) and seventh (7th) day premium, a person not at work due to holiday, vacation, funeral leave or jury duty shall be deemed as having fulfilled the requirement that he/she works all scheduled hours during the week to earn the premium(s). A day, for the purposes of computing the sixth (6th) and seventh (7th) day premium, shall be calculated as the twenty-four (24) hour period governed by the scheduled starting time for a new work week by work assignment.

      b.     Should the Company introduce a non-traditional shift schedule (for example, a ten (10) hour per day, four (4) days per week schedule), all hours in excess of the scheduled work day will be paid at time and one-half. The Company will meet with the Union membership to discuss the impact of such schedule on other pay provisions set forth in the labor agreement.

**Section 6**        **Rate for Temporary Assignments**

      If an employee works on a job paying a higher rate than his or her own, the employee shall receive the higher rate for the time worked on such higher rated job. When the Company temporarily assigns an employee to a job paying a lower rate than his or her regular job, the employee shall be paid his or her regular rate. An employee transferred to a lower rated job on an optional basis shall, if the employee accepts the transfer, be paid at the rate applicable to the job performed.

**Section 7**        **Call Time**

      If an employee is called to work at a time other than his or her scheduled reporting time, and after having left the plant premises, the employee shall be allowed a minimum of four (4) hours straight time or time and one-half the actual hours worked, whichever is greater. Call time premium pay shall not apply in those instances in which an employee is either scheduled to report prior to the normal starting time or is called in and continues to work into his or her normal shift hours. In these cases the employee will receive the applicable overtime rate.

**Section 8        Report Time**

        An employee reporting for work at his or her scheduled time shall be guaranteed four (4) hours work at his or her regular straight time rate or the applicable premium rate, except in case of storm, flood, accident, power breakdown, or other causes beyond the control of the Company, or unless the employee has been notified not to report by posting of a notice on the bulletin board  prior to the end of his or her shift on the preceding day, or by messenger or telephone at the employee's residence (as listed on the Company's records) at least one (1) hour prior to the beginning of the employee's regular shift.  The Company, in its discretion, may either pay for the guaranteed four (4) hours or may assign the employee to any work in the plant which the Company desires to have performed.

**Section 9        Non-Traditional Work Schedules**

        The Company may, for business reasons, implement non-traditional work schedules in specific departments or plant-wide as required.

        A non-traditional work schedule is one that differs from the regular eight (8) hour day, forty (40) hour work week.  The work week begins on the day employees are assigned a non-traditional schedule and continues through seven (7) consecutive calendar days.  The work day begins at the start time an employee is assigned a non-traditional shift and continues through twenty-four (24) consecutive hours.  The Company will give the Union thirty (30) day notice prior to implementing a non-traditional work schedule.

        When overtime is scheduled, time and one-half will be paid for all time worked in excess of scheduled hours per day, or for all hours worked in excess of forty (40) hours in one week. There shall be no duplication of overtime or premium pay and payments pursuant to this Section shall be credited against overtime or premium pay on any other basis.

**ARTICLE IV        HOLIDAYS**

**Section 1        Recognized Holidays**

    a.        The following will be recognized as holidays (7:00 a.m. on the named day to 7:00 a.m. on the day immediately following:)

| | |
|---|---|
| **NEW YEAR'S EVE DAY** | **LABOR DAY** |
| **NEW YEAR'S DAY** | **THANKSGIVING DAY** |
| **PRESIDENT'S DAY** | **DAY AFTER THANKSGIVING** |

8

| GOOD FRIDAY | CHRISTMAS EVE DAY |
|---|---|
| MEMORIAL DAY | CHRISTMAS DAY |
| INDEPENDENCE DAY | |

b.      The hours of commencing and ending as set forth in the above list, may be varied by mutual agreement of the Company and the Union, and the specified hours of commencing and ending will be adjusted to coincide with the regular hours of changing shifts.

**Section 2      Hours Worked on Holidays**

a.      Hours worked on Christmas Day, New Year's Day, Independence Day, Labor Day, and Thanksgiving Day, shall be paid at double time.  Other holidays set forth in the above list shall be paid at time and one-half.  If two (2) or more premium pay sections apply, the affected employee will be paid under the one which will pay him/her the greatest amount and not under more than one (1) provision.

b.      The holiday premium shall not apply to the first shift following the holiday should an employee be asked to begin the shift earlier than 7:00 a.m., provided, however, the holiday premiums shall apply to any hours worked on that shift which are more than two (2) hours prior to the scheduled starting time of that shift.

**Section 3      Holiday Allowance**

a.      A holiday allowance equal to eight (8) times their basic hourly rates will be given for the foregoing holidays to all employees who qualify therefore under both the following conditions.

1.      Continuous employment by the Company for at least thirty (30) calendar days prior to the holiday, and;

2.      The employee shall have worked the employee's last scheduled shift before the holiday, the employees first scheduled shift after the holiday, and the holiday, if the employee has agreed or is scheduled to work on the day, unless the employees absence on these respective days has been occasioned by the following justifiable causes:

(a)      Sickness of such a nature that the employee was unable to report for work or had to leave work early due to sickness.  Proof of such sickness may be required.

9

(b)   Sickness of a member of the employee's immediate family requiring the employee's presence.  Proof of such sickness and requirement may be required.

b.   If a listed holiday falls when an employee is away from his or her job, the employee shall receive the applicable holiday allowance after the employee returns to work, provided that the employee is otherwise qualified for such holiday allowance and such period of absence shall not have exceeded sixty (60) days.  Payment under this provision shall be limited to two (2) holidays in any one period of absence.

## ARTICLE V          VACATIONS

a.   Each employee hired prior to February 1, 1997 by the prior Company, with continuous Company service of one (1) year or more who meets the qualifications specified in this Article shall become eligible for vacations and vacation pay in accordance with the following schedule and conditions except as provided in Section (i) of this Article.

| (1) Length of Service | Length of Vacation | Vacation Pay % of 52 Weeks earnings Next preceding December 31st |
|---|---|---|
| 1 year but less than 3 Years | 1 week | 2% |
| 3 years but less than 7 years | 2 weeks | 4% |
| 7 years but less than 15 years | 3 weeks | 6% |
| 15 years or more | 4 weeks | 8% |

The following vacation schedule will apply to each eligible employee hired by the prior Company or by Rand-Whitney Container LLC on or after February 1, 1997 with continuous Company service of a year or who meets the qualifications specified in this Article, as provided for in Section (i) of this Article.

| (2) Length of Service | Length of Vacation | Vacation Pay % of 52 Weeks earnings Next preceding December 31st |
|---|---|---|
| 1 year but less than 3 Years | 1 week | 2% |
| 3 years but less than 8 years | 2 weeks | 4% |
| 8 years but less than 15 years | 3 weeks | 6% |
| 15 years or more | 4 weeks | 8% |

10

For the first vacation of any employee, vacation pay will be based on the fifty-two (52) weeks preceding the employee's first anniversary. The employee will then be eligible for their next week of vacation during the following year after the employee has worked 1,040 hours from the date of his or her first anniversary. Subsequent weeks of vacation will be earned as follows:

    (1)    The employee shall have worked at least 1,040 hours, including overtime hours, for the Company during the twelve (12) calendar months from January 1 through December 31 immediately prior to the vacation period. Employees will become eligible for additional weeks of vacation on their anniversary date of hire, as outlined above. Employees hired after November 1 in a given year will have the option of deferring the additional week of vacation from the year of eligibility to the first quarter of the following year. Vacation selection will be considered after all other vacations which normally come due in that year.

    (2)    The Company will pay two percent (2%) of W-2 earnings per week of vacation. In those cases where two percent (2%) does not equal forty (40) hours of pay, the Company will add the lost earnings to the W-2 due to plant shutdown, active military duty or National Guard/Reservist duty only, at the last rate of pay earned in the W-2 year, and then the Company will pay two percent (2%) of this amount per week of vacation not to exceed forty (40) hours of pay.

    b.    Time lost as a direct result of accidental injury incurred while the employee was actually working on his or her job shall be counted in computing the 1,040 hours necessary to qualify him/her for a vacation on the first eligibility date following such accident. Time off as a result of attending Union negotiations shall be considered in a like manner. Each full workday so lost shall be credited at eight (8) hours.

    c.    The vacation year shall extend from January 1st to December 31st. A vacation week shall be seven (7) consecutive days. The Company shall schedule each employee's vacation and shall administer the vacation program. Consistent with production requirements, preference will be given where practicable to the employee's plant seniority. The Company may close all or part of its operation in order to accomplish the vacation schedule. Accordingly, the Company reserves the right to schedule vacation shutdown(s) for up to two (2) weeks per year provided employees are given notice of such shutdown(s) by April 1.

11

d.      Insofar as it is practicable, the Company will follow a procedure for scheduling vacations which will allow employees to submit vacation requests by January 2 and will publish an approved vacation schedule by January 31.  Vacation requests submitted after January 15 of each year will be considered by the Company based upon available open dates and granted on a first come first serve basis, regardless of seniority.  An employee failing to submit a vacation request, in accordance with the above, will take whatever vacation is available.  The approved vacation schedule may be changed later to accommodate production schedules.  In the event the Company decides to close the plant for the vacation period and some employees are required to work, their vacations will be rescheduled.

e.      The Company favors every eligible employee have his or her full vacation period as time off from work in addition to his or her vacation pay.

f.      Vacation may not be accumulated from year to year and are not transferable.

g.      If a holiday falls during the time an employee is on vacation, the employee will be paid for the holiday in lieu of time off, provided the employee is qualified as stated in Article IV.

h.      Employees shall receive their vacation pay at the time they take their vacation.

i.      Employees hired by Rand-Whitney Container LLC on December 19, 1998, who were employed by the prior Company shall be given credit for one-half (½) of their total service with the prior Company and full credit for their Rand-Whitney service for the purpose of determining their vacation entitlement in accordance with Section (a). of this Article.  Employees hired by Rand-Whitney after December 19, 1998 shall be eligible for vacation in accordance with Section (a-2) of this Article.

**ARTICLE VI      SENIORITY**

**Section 1      Types of Seniority**

        Plant seniority dates from the time of the most recent hire.  Job seniority starts on the date the employee is classified in an occupation on a permanent basis.  Job seniority is accumulated in the current job and is senior to jobs below in the same job progression.

**Section 2      Promotions and Demotions**

        If employees are to be promoted, demoted, the Company shall take into consideration seniority, fitness, and ability; and when all the factors that constitute fitness and ability are relatively equal, seniority shall prevail.  Seniority shall be construed to mean job

12

seniority for purposes of promotion and demotion, except when the employee is in the bottom job of progression. Seniority need not apply to temporary promotions not contemplated to exceed one (1) week.

**Section 3        Lines of Progression**

When a permanent vacancy exists in a line of progression, it shall first be offered to employees in the same classification on all shifts in order of seniority. If not filled in this manner, the opportunity for promotion will be offered to senior employees in the next lower job in the line of progression. In all cases, the junior qualified employee, as noted above, must progress to said permanent vacancy.

**Section 4        Transfers**

a.        An employee may transfer from his or her present job to the bottom job in a line of progression as provided hereafter. Copies of Request for Transfer will be provided for the employee and for the Union, and the Union will be advised when the transfers are granted. The employee should inform his or her supervisor of the job to which the employee desires to be transferred and fill out the transfer request forms. The Company shall consider his or her request, taking into account his or her entire record, including the training and experience needed for the desired job. The Company may give further tests to the employee if it deems them desirable.

b.        Jobs not filled by job progression will be posted on the bulletin board for seventy-two (72) hours to enable all employees the opportunity to request transfer to such jobs.

c.        If the request for transfer is denied, the Company will explain the reasons for this action to the employee and may make suggestion which will enable him/her to qualify for such transfer at a later date. If the request for transfer is to be granted, the employee's name will be placed on a waiting list for such job, with openings for that job being filled by the employee on the list with the most plant seniority.

d.        After the employee is transferred, he/she shall retain his/her job seniority on the job from which he/she was transferred for a period of thirty (30) days, and such job seniority shall apply in the event of failure to qualify in his/her new job or his/her desire to return to the former job. In the event that an employee returns to his/her former job within the thirty (30) day period provided above, the time spent on the new job shall count as job seniority in the former

job. An employee who voluntarily returns to his/her former job after a thirty (30) day period will revert to the Department Helper classification and will forfeit any bidding rights on any permanent job vacancy for twelve (12) consecutive months from date said employee returns to his/her former job. In the event the employee's new job is eliminated by reduction in force, or layoff, within six (6) months of their transfer, the employee may return to his/her prior job and the time spent on the new job shall count as job seniority in the former job.

     e.     An employee awarded a bid job paying the same as, or lower than, his/her former job, will forfeit all bidding rights for a period of six (6) months to any jobs paying lower than his/her former job.

     f.     The Company reserves the right, at its discretion, to re-assign general helpers to departments or operation as needed to balance shifts and/or to maintain manning requirements.

     g.     Employees may be temporarily transferred to another job and/or department, by reverse seniority, if qualified, for a period not to exceed ninety (90) days. Upon mutual agreement between the Company and the Union, this period may be extended for an additional thirty (30) days.

**Section 5     Layoffs**

     If an employee in the bottom job in a job progression is subject to layoff due to reduction in force, the employee may exercise his or her plant seniority to displace the employee with the least plant seniority in the job classification of Department Helper in any department.

**Section 6     Bumping**

     a.     In the event of a reduction in force, shift or classification, expected to have a duration of at least two weeks, the employee affected will use one of the following alternatives:

          1.     Will displace junior employee within same classification on same shift.

          2.     If this move is not available, the employee will displace his/her junior employee in same classification on preferred shift.

          3.     If this move is not available, the employee will displace his/her junior employee on preferred shift in the next job classification.

          4.     In the event the first three alternatives are not available, Article VI, Section 5 (Layoffs) of the contract agreement will prevail.

5. Fitness, ability to continue the function of the job, and seniority, will be considered in offering these procedures.

6. In the event the employee's previous job is reopened within four (4) months of his/her transfer, which was due to a reduction in force, shift or classification, the employee will return to his/her prior job.

7. The Union Committee and affected employee will be notified one (1) week in advance of job assignment changes.

b. An employee laid off due to lack of work, who has been employed continuously by the Company for sixty (60) calendar days or more during his or her last period of employment, shall have the right to reinstatement without breaking continuous service when a vacancy occurs in a job which the employee is qualified to perform provided the employee reports to the Personnel Office of the Company in person or by letter not later than the 15th day of each month the layoff continues to signify his or her desire to return to work. Right of reinstatement will be for a period of one (1) year, subject to the above conditions. Length of continuous service shall be broken by:

1. Voluntarily termination or quitting by an employee

2. Discharge

3. Layoff for more than twelve (12) months

4. Fails to report within forty-eight (48) hours of recall from layoff after having been notified to do so by the Company at the employee's last address as shown on the Company's records.

**Section 7      Probationary Employees**

New employees shall be classified as probationary employees until they have been an employee of the Company for ninety (90) calendar days, (which period may be extended thirty (30) days upon notice to the Union) after which their plant seniority and employment continuity shall date back to the date of commencing work. The termination of employees with less than one hundred twenty (120) days of employment shall not be subject to the grievance or arbitration procedures.

**ARTICLE VII          WAGES**

a. It is agreed that the negotiated rates of pay and job classifications set forth in

15

Exhibit A, attached hereto are made a part hereof and shall be effective as shown.

      b.     When a new job is created, or when there are substantial changes in the content of an existing job, the Company may set a temporary rate therefore; the regular rate and the effective date will be negotiated with the Union.

      c.     Checker Loaders will be paid $2.50 per hour for time spent moving trailers.

## ARTICLE VIII      FUNERAL LEAVE

      a.     An employee with thirty (30) calendar days or more of plant seniority will be granted an excused funeral absence from scheduled work for three (3) calendar days, which must be used from the date of death until two (2) days after the date of the funeral, in the event of the death of his or her spouse, child or stepchild, grandchild, mother or stepmother, father or stepfather, grandmother or grandfather, sister or brother, father-in-law, mother-in-law, brother-in-law, and sister-in-law.

      b.     An allowance of eight (8) hours pay per day at the employee's basic hourly rate for time lost from scheduled work will be paid by the Company.

      c.     If an employee is at work when the death occurs, then the Company will pay up to four (4) hours at straight time for time lost due to leaving work early.

      d.     The maximum number of hours payable by the Company for funeral leave will be a maximum of eight (8) hours per day at the employee's basic rate with no premium pay whatsoever for an overall maximum of twenty-eight hours.

      e.     To be eligible for funeral leave pay as outlined above, the following conditions must be met:

          1.     No allowance will be given unless the employee gives the Company notice, both of his or her intended absence from scheduled work and the time and date the employee intends to return to work.

          2.     Promptly upon returning to work, the employee must apply for the allowance on a form provided by the Company. Proof of relationship to the deceased may be required.

          3.     No funeral allowance will be paid for a contract holiday.

          4.     No funeral allowance will be paid if the employee does not attend a funeral service; and

5. The allowance will be paid only for scheduled work time lost and will not be counted in computing overtime.

## ARTICLE IX        JURY LEAVE

When an employee with thirty (30) calendar days or more plant seniority is required to perform jury duty, the employee will be given a daily supplement for each day on which he/she received jury pay of the difference between his or her jury pay and eight (8) times his or her basic hourly rate to a maximum of twenty (20) days in any two (2) year period. The supplement will be given under the following conditions:

1. The employee must give the Company reasonable prior notice of his or her intended absence from scheduled work and the time and date the employee intends to return to work.

2. Upon the employee's return to work, the employee must apply for the supplement on the form provided by the Company. The employee may be required to furnish proof of jury duty.

3. The supplement will not be given for a recognized holiday; and

4. The supplement will be given only for scheduled work time lost and will not be counted in computing overtime.

## ARTICLE X        CONTINUITY OF OPERATIONS

a. While this Agreement is in effect, on the part of the Union, there shall be no interruption, slowdown, stoppage, strike, or cessation of work. On the part of the Company, there shall be no lockout.

b. In the event of an interruption, slowdown, stoppage, strike or cessation of work, the Company will notify the International and Local Unions and will not hold them liable for such action provided:

1. Within twenty-four (24) hours of time of notification, the International and Local Unions disavow responsibility for the action and order their members to return to work; and

2. The International and Local Unions in the utmost good faith use their best efforts to terminate such action; and

3. Authorized representatives of the respective International and Local

17

Unions submit to the Company notices which state that the action is unauthorized and which order their members to return to work. The Company may then post or distribute these notices.

c.       The Company may impose any disciplinary action it deems appropriate, including discharge, on any employee participating in, supporting or encouraging such action. The Company's action shall not be subject to the grievance or arbitration procedures. However, the issue of whether or not an employee participated in, supported or encouraged such action, is subject to the grievance and arbitration procedures.


**ARTICLE XI          LEAVES OF ABSENCE**

**Section 1      General**

Requests for leaves of absence must be submitted in writing sixty (60) days before the date desired. The Company will allow or deny the request within fourteen (14) days of receipt of same. If the Union feels the denial is unreasonable, it will sit down with the Company to discuss same. Extension of leaves of absence must be requested before the expiration of the original leave of absence.

Employees out of work as a result of sickness, accident or industrial injury shall have a right of reinstatement for a period of one (1) year provided they have completed one (1) year of service. Employees with less than one (1) year of service shall have the right of reinstatement for a period equal to their length of service. Employees out of work as a result of sickness, accident or industrial injury shall continue to be covered by the Company's medical program provided they remit their required portion of the premium for up to six (6) months.


**Section 2      Military Duty**

Employees who enter the Armed Services of the United States shall be entitled to all benefits specified by law upon their return to work following such service.


**ARTICLE XII          ADJUSTMENT OF GRIEVANCES**

a.       If an employee is called into the office by supervision, the employee may at that time ask for a steward to represent him/her. When the steward arrives at the office, he/she may, at that time, ask for time to sit with the employee to discuss the matter prior to meeting with supervision.

18

b. If an employee feels aggrieved, an earnest effort will be made to settle the employee's grievance immediately following in order the steps outlined below, but nothing in this Article shall be construed as prohibiting the employee from informally arriving at a settlement of such grievance with his or her Foreperson.

**FIRST STEP:** The aggrieved employee shall notify his or her Foreperson within three (3) working days after the employee reasonably could have had knowledge of the event on which the grievance is based. The Company shall schedule a meeting within five (5) working days upon receipt of the grievance. The Foreperson shall reply within three (3) working days after meeting with the employee and, if the employee so desires, the employee's Union steward. In any event, there should be an oral discussion between the parties.

**SECOND STEP:** If the Union wishes to proceed, the Superintendent shall be notified within five (5) working days after the Foreman's reply. At this step and at subsequent steps, the grievance shall be presented in writing. The Company will schedule a meeting within five (5) working days upon receipt of the grievance. The Superintendent shall reply within five (5) working days after the meeting with the aggrieved employee and a representative of the Union.

**THIRD STEP:** If the Union wishes to proceed, the Manufacturing Manager shall be notified within five (5) working days after the Superintendent's reply. The Company will schedule a meeting within five (5) working days upon receipt of the grievance. The Manufacturing Manager shall reply within five (5) working days after meeting with the Union Committee.

**FOURTH STEP:** If the Union wishes to proceed, the Manufacturing Manager shall be notified within five (5) working days after his or her reply in the Third Step. The President of the International Union and the President of the Company, or their representatives, shall meet. If they are unable to agree, the matter may be carried to arbitration as provided in Article XIII.

19

c.    A grievance submitted by the Union regarding the discharge of an employee will be started at the third step of the aforementioned procedure.

d.    Any discharge case not protested in writing by the Union within five (5) days of its occurrence, shall be deemed waived.

e.    Waiver of the various time limits set forth above shall not constitute a precedent.

## ARTICLE XIII          ARBITRATION

a.    In the event that a grievance is not settled by the procedure established in Article XII and the Union by written notice to the Company given within fifteen (15) calendar days of the answer in the fourth step request arbitration, or in the event that the Company has a grievance against the Union, the matter shall be referred to an arbitrator mutually selected from a list supplied by the American Arbitration Association.

b.    The hearing shall be held as soon as practicable and the decision rendered as soon after the hearing as possible.   Such decision shall be final and binding on the Company, the Union and the employees. The arbitrator shall have no power to add to, subtract from, or modify any of the provisions of this Agreement.   The matter of wages is not to be a subject of arbitration.

c.    All expenses incidental to the services of the arbitrator shall be borne equally by the Company and the Union.

## ARTICLE XIV          PENSION

a.    On February 1, 1999, Rand-Whitney instituted a new Rand-Whitney Pension Plan.

b.    Effective February 1, 2012, the benefit level will increase to twenty-seven dollars ($27.00) per month per credited year of service with Rand-Whitney earned after February 1, 2012 (future service only).

c.    Effective February 1, 2013, the benefit level will increase to twenty-eight dollars ($28.00) per month per credited year of service with Rand-Whitney earned after February 1, 2013 (future service only).

d.    Effective February 1, 2014, the benefit level will increase to twenty-nine dollars ($29.00) per month per credited year of service with Rand-Whitney earned after February 1, 2014 (future service only).

20

e.      Credit will be given for employment service with the prior Company for vesting purposes only in the Rand-Whitney Container LLC, pension plan.

f.      The full details of the pension plan are outlined in the pension plan distributed to all employees.

## ARTICLE XV                    GENERAL

**Section 1      Bulletin Boards**

Bulletins relating to Union activities may be posted on the bulletin board provided by the Company.  The Company reserves the right of approval for material to be posted.

**Section 2      Non Discrimination**

a.      The Employer and the Union have a fundamental policy to provide equal opportunity to all qualified individuals in its recruitment and hiring practices, and to assure that there shall be absolutely no discrimination against any employee on the grounds of race, color, religion, national origin, ancestry, sex, age or disability.  It is also the policy of the Company to provide equal opportunity to all qualified disabled veterans and veterans of the Vietnam era without discrimination as provided in the regulations issued by the Department of Labor under the Vietnam Era Veteran's Readjustment Act of 1974.

b.      Whenever the masculine pronoun is used in this Agreement, the parties agree that it shall include and refer to the feminine pronoun, e.g., he/she, where appropriate to carry out the intention of the above paragraph.

**Section 3      Insurance**

Insurance benefits shall be those agreed to by the Company and the Union shown in Exhibit B.

**Section 4      Job Progression**

Lines of job progression are shown in Exhibit C.

**Section 5      Discharge and Termination**

The Company will notify the Union in writing when an employee is discharged and will also notify the Union of all other terminations. However, prior to termination, an employee will be suspended pending termination for a maximum of ten (10) days to give the

21

parties time to investigate.

**Section 6        Disciplinary Offenses**

If an employee has no disciplinary offenses for a period of 365 calendar days, his/her oldest offenses shall not be used when administering future progressive discipline and the employee shall drop back one (1) step in the progressive disciplinary process.  This procedure will be used for each successive 365 calendar day period during which an employee has no disciplinary offenses.

**Section 7        Supervisors**

a.        Supervisors will not replace Bargaining Unit employees in performing work customarily done by Bargaining Unit employees, except as required for training, instruction, experimental work, or an emergency when such action is necessary for the continuity of plant operation.

b.        An employee who is promoted to a permanent job outside the Bargaining Unit shall retain his or her seniority and status within the Bargaining Unit for a period of ninety (90) days.

**Section 8        Seniority List**

The Company will provide to the Local Union Committee an updated seniority list on a quarterly basis.

**Section 9        401(K) Plan**

The Company has established a 401(k) plan, which shall be funded solely by employee contributions.

**Section 10        Accident Reports**

The Company will provide the Union with all accident reports whether recordable or not.  Such reports will not include any medical records.

**Section 11        Cafeteria 125 Plan**

The Company has instituted a Section 125 Cafeteria Plan effective January 1,

22

2005 to enable employees to set aside pre-tax money for medical and/or dependent care expenses.

**Section 12      Summer Help**

a.    The Company can hire up to six (6) summer help at $11.00 per hour between May 1st and September 15th.

b.    Summer help is not eligible for overtime unless all other employees refuse.

c.    Summer help shall not serve as an Operator.

d.    Summer help will not receive any benefit of an economic nature except for holiday pay if they meet eligibility requirements of Article IV.

**Section 13      Fulfillment Operation**

a.    The Company may establish a fulfillment operation for work outside the traditional manufacturing process.

b.    Such work would be presented to the fulfillment center for process after it has been produced through the plant.  The inconsistent demand associated with this type of work requires a flexible workforce.  Therefore, the company intends to use a temporary workforce to do the following:

1.    "Hand-finishing" (stapling, hand gluing, assembly and collation) of components associates with corrugated displays.

2.    Assembly and collection of corrugated components not associates with current equipment capabilities (set up and assembly of a tray and insert into a single unit for shipment).

c.    The work would be restricted to a designated area in the plant and temporary workers would not be used to fill in for union employees under any circumstances.

d.    Temporary workers used may be leased employees.

e.    The fulfillment operation shall not operate on a forty (40) hour week or fifty-two (52) weeks per year.

**ARTICLE XVI**                **SEPARABILITY**

    a.    Nothing in this Agreement shall require the Company to do anything which is contrary to or inconsistent with any present or future Federal or State legislation, order, rule, regulation, directive or decision.

    b.    The invalidity or unenforceability of any term or provision of this Agreement by reason of any present or future Federal or State legislation, order, rule, regulation, directive or decision shall not effect the remaining provisions of this Agreement.

**ARTICLE XVII**        **COMPLETENESS OF AGREEMENT**

    This Agreement constitutes all the agreements between the parties concerning wages, hours and conditions of employment in effect at the time of its signing; all previous agreements, including those agreements commonly referred to as "Side Agreement" not incorporated in this Agreement are null and void.  Rand-Whitney Container LLC assumes no past practices of the predecessor Company.

**ARTICLE XVIII**        **TERM OF AGREEMENT**

    a.    This Agreement shall be in effect from February 1, 2012 until February 1, 2015.

    b    This Agreement shall be binding upon the successors and assigns of the parties

    c.    If any party desires to terminate this agreement or to change any provision thereof, it shall give written notice of such desire to the other party at least sixty (60) days prior to the expiration date.

    d.    The giving of such notice as provided above shall obligate both parties to arrange conferences and negotiate all questions at issue in good faith.

    e.    This Agreement was ratified by Local Union 4-0902 of the United Steelworkers.

AGREED TO AND EXECUTED AS OF _____*June 20*_____, 2012.

United Steelworkers of America,
AFL-CIO-CLC

*Leo W. Gerard*

Leo W. Gerard, International President

Rand-Whitney Container LLC

*R. Minton*

Richard Minton, VP of RWC

24

Stanley Johnson
International Secretary-Treasurer

Lee Farris, Production Manager

Thomas Conway
International Vice President-Administration

Marisol Jimenez
Human Resources Coordinator

Leon Lynch
International Vice President-Human Affairs

William J. Pienta
Director - District 4, USWA

Staff (Business) Representative

## LOCAL UNION 4-0902

Harold Eldred
President Local 4-0902

Randall Mahoney
Vice President

Claude Nieman
Treasurer

Daniel Winters
Financial Secretary

Juan Jimenez
Recording Secretary

Thomas Roskosky
Chief Steward

# EXHIBIT A
## RATE SCHEDULE
### RAND-WHITNEY CONTAINER
### NEWTOWN, CONNECTICUT PLANT

| Corrugating Department: | 02/01/2012 | 02/01/2013 | 02/01/2014 |
|---|---|---|---|
| Corrugator Operator | $21.17 | $21.70 | $22.24 |
| Slitter Scorer Operator | $21.17 | $21.70 | $22.24 |
| Doublebacker Operator | $19.90 | $20.40 | $20.91 |
| Clamp Truck Operator | $19.04 | $19.52 | $20.01 |
| Stacker Operator | $19.00 | $19.48 | $19.97 |
| Starchmaker | $17.97 | $18.42 | $18.88 |
| Baler | $17.97 | $18.42 | $18.88 |
| Department Helper | $17.34 | $17.77 | $18.21 |
| New Hires | $16.68 | $17.10 | $17.53 |
| | | | |
| **Converting Department:** | | | |
| Operator (Emba 170, Emba 244, Rapidex, United) | $20.93 | $21.45 | $21.99 |
| 1st Helper (Emba 170, Emba 244, Rapidex, United) | $19.31 | $19.79 | $20.28 |
| Die Room Person | $20.59 | $21.10 | $21.63 |
| Floater | $18.74 | $19.21 | $19.69 |
| Stitcher Operator | $17.87 | $18.32 | $18.78 |
| Semi-Operator | $17.87 | $18.32 | $18.78 |
| Slitter Operator | $17.59 | $18.03 | $18.48 |
| Stitcher Helper | $16.84 | $17.26 | $17.69 |
| Semi-Helper | $16.84 | $17.26 | $17.69 |
| Department Helper | $16.68 | $17.10 | $17.53 |
| New Hires | $16.68 | $17.10 | $17.53 |
| | | | |
| **Shipping Department:** | | | |
| Checker Loader | $19.83 | $20.33 | $20.84 |
| Power Truck Operator | $19.48 | $19.97 | $20.47 |
| Strapper Operator | $17.72 | $18.16 | $18.61 |
| New Hires | $16.68 | $17.10 | $17.53 |
| | | | |
| **Maintenance Department:** | | | |
| Electrician | $28.77 | $29.49 | $30.23 |
| Master Mechanic | $27.27 | $27.95 | $28.65 |
| Class AA Mechanic | $23.77 | $24.36 | $24.97 |
| Class A Mechanic | $22.50 | $23.06 | $23.64 |
| Class B Mechanic | $21.30 | $21.83 | $22.38 |
| Maintenance Class C | $19.82 | $20.32 | $20.83 |
| Department Helper | $17.12 | $17.55 | $17.99 |
| New Hires | $17.12 | $17.55 | $17.99 |

## SHIFT DIFFERENTIAL

**SECOND SHIFT** ..............................................................................................................$.30 PER HOUR
**THIRD SHIFT** ...............................................................................................................$.30 PER HOUR

Shift Differential will be paid only to those employees who work the actual shift hours.  Shift differential will be included in holiday pay to those employees assigned to the second and third shifts.

EXHIBIT "B"

INSURANCE

**Section 1      Insurance**

    a.    Rand-Whitney Container LLC will provide employees as a base medical plan the Anthem Blue Cross and Blue Shield of Connecticut HMO Plan.  Under this program, employees will select a primary care physician who will serve as a gatekeeper for substantially all of his/her medical services.  Employees will be required to contribute toward the premium cost on a weekly basis effective February 1, 2012 as follows:

|  |  |
|---|---|
| Family Coverage | $80.61 Per Week |
| *Two (2) Person Coverage | $65.09 Per Week |
| Individual Coverage | $37.13 Per Week |

    * (*"Grandfathered" employees only*)

    Effective January 1, 2013, 2014 and 2015 increases in premium cost will be shared between the Company and the employees on a 50%/50% basis except that employee cost increases in any one year will not exceed eleven dollars and fifty cents ($11.50) per week for family and for two (2) person coverage and six dollars and fifty cents ($6.50) per week for individual coverage.

    Employees will also be able to select a Point of Service (POS), which provides an out of network coverage option.  Employees who select this plan will pay the (HMO) premium set forth in the preceding paragraph plus the full cost of any differential in the premium cost between the base HMO plan and the Point of Service (POS).

    Premium decreases will be shared with the employee on the same basis as increases.  In no event, however, will the decrease result in a contribution level less than $72.43 per week for Family Coverage, $56.91 per week for Two (2) Person Coverage or $31.95 per week for Individual Coverage.

    The Company reserves the right to change health insurance providers provided comparable coverage is offered.

All new hires after the date of ratification will only be able to select individual or family coverage.

      b.      **Plan Design**

The Company, through its Human Resources or Benefits Department, will provide an employee with the current plan design description.

**Section 2**     **Sickness and Accident Insurance**

The sickness and accident benefit will be as follows:

February 1, 2012 - Per Week ..................................................................................$315.00

February 1, 2013 - Per Week ..................................................................................$325.00

February 1, 2014 - Per Week ..................................................................................$335.00

Benefits will be paid from the first day of an accident and the third day of an illness for twenty-six (26) weeks.

**Section 3**     **Life Insurance**

As of February 1, 2012, the Company will provide a life insurance policy in the amount of $27,000 Life and $27,000 Accidental Death and Dismemberment.

As of February 1, 2013, the Company will provide a life insurance policy in the amount of $28,000 Life and $28,000 Accidental Death and Dismemberment.

As of February 1, 2014, the Company will provide a life insurance policy in the amount of $29,000 Life and $29,000 Accidental Death and Dismemberment.

EXHIBIT C

LINES OF PROGRESSION

## Corrugating Department

Corrugator Operator
Slitter Scorer Operator
Doublebacker Operator
Clamp Truck Operator
Stacker Operator
Starchmaker
Department Helper

## Converting Department

Operator (Emba 170, Emba 244, Rapidex, United)
1st Helper (Emba 170, Emba 244, Rapidex, United)
Die Room Person
Floater
Stitcher Operator
Semi Operator
Slitter Operator
Stitcher Helper
Semi Helper
Department Helper

## Shipping Department

Checker Loader
Power Truck Operator
Strapper Operator

## Maintenance Department

Electrician
Master Mechanic
Class AA Mechanic
Class A Mechanic
Class B Mechanic
Maintenance Class C
Department Helper

**\* Die Room - bidding by seniority in the Converting Department.**

LINES OF PROGRESSION
EXHIBIT D

**LINES OF PROGRESSION GUIDELINES FOR THE MAINTENANCE DEPARTMENT**

**Maintenance Class C:**
General skill requirements:

a. Maintain parts and material inventory utilizing maintenance computer software, and be able to find and identify maintenance parts.
b. Should be able to contact and communicate with suppliers. Assure delivery of materials as needed.
c. Purchase necessary parts and supplies at most competitive prices and the highest quality.
d. Responsible for snow removal.
e. Capable of operating and maintaining the Beckart System.
f. Assists with maintenance general help duties including painting, cleaning, basic carpentry, plumbing and machinery repair.
g. Must be ready to assist on maintenance projects, breakdowns and rebuilds as needed.
h. Must be available for emergency call-in.
i. Must have a valid driver's license.
j. Must have general working knowledge of all plant and regulatory safety codes.
k. General knowledge of maintenance department equipment and procedures.
l. Any other duties the Maintenance Supervisor deems necessary.

**Class B Mechanic:**
General skill requirements.

a. General knowledge of maintenance department equipment and procedures.
b. Basic welding skills.
c. Basic troubleshooting skills.
d. Basic electrical repairs.
e. Basic hydraulic repairs.
f. Basic pneumatic repairs.
g. Basic lubrication procedures.
h. Basic diagram and manual reference skills.
i. Ability to perform more complicated repairs under supervision.
j. Must have general working knowledge of all plant and regulatory safety codes.
k. Ability to assist in all Preventative Maintenance tasks.
l. General knowledge of all plant machinery.
m. Score at least 70% on TAPPI maintenance III qualification exam.

**Class A Mechanic:**
General skill requirements:

a. All the requirements of Class B Mechanic with a high level of proficiency.
b. Be capable of diagnosing and correcting mechanical and electrical malfunctions with minimal supervision.
c. Score at least 70% on TAPPI maintenance II qualification exam.

31

**Class AA Mechanic:**
General skill requirements:
    a.    All the requirements of Class A Mechanic with a high level of proficiency.
    b.    Be capable of diagnosing and correcting mechanical and electrical malfunctions with little or no supervisory direction.
    c.    Score of at least 70% on TAPPI maintenance I qualification exam.

**Master Mechanic:**
General skill requirements:
    a.    All of the requirements of the Class AA Mechanic with the highest level of proficiency.
    b.    Must be capable of rebuilding equipment to OEM specifications with no supervision.
    c.    Must be capable of installing equipment by utilizing engineering drawings.  This is to include all utilities and peripheral services.
    d.    Must be capable of diagnosing and solving mechanical and electrical malfunctions with no supervision.
    e.    Must be capable of instructing others and aiding in their learning experience on both mechanical and electrical applications.

**Electrician:**
General skill requirements:
    a.    Must possess a minimum of 8000 hours of electrical experience
    b.    Must have achieved the minimum of 2000 hours of technical training or the equivalent of a journeyman status by the state electrical standards.
    c.    Must be proficient in all aspects of electrical voltage, distribution, code interpretation and application.
    d.    Must have the ability to work without supervision and to train mechanics of all levels in safe electrical work practices.

**EXHIBIT E**
**SUPPLEMENTAL MEMORANDUM OF AGREEMENT**

1.    Job responsibility guidelines for all intent and purposes are an expressed part of this Agreement.

2.    One person feed to be limited to fifteen square feet.

3.    Temporary Supervisors - If an employee is assigned temporarily to a supervisor position for less than ninety (90) accumulated days, said employee will retain former job seniority rights.  If the assignment is in excess of ninety (90) accumulated days, said employee will revert to the work force without seniority of status. (Per Annum)

4.    When the current part time waste water treatment person retires, the duties of the job will be performed by the Maintenance Department employees qualified to perform the work.

**Safety Shoes**

5.    As of February 1, 2012, the Company will give each employee with at least six (6) months of service up to one hundred twenty-five ($125.00) dollars for safety shoes upon proof of purchase by providing one submission for each year of the contract.

New employees will be given one hundred twenty-five ($125.00) dollars upon completion of six (6) months of service and upon providing proof of purchase by providing a receipt.

As of February 1, 2013, the Company will give each employee with at least six (6) months of service up to one hundred thirty ($130.00) dollars for safety shoes upon proof of purchase by providing one submission for each year of the contract.

New employees will be given one hundred thirty ($130.00) dollars upon completion of six (6) months of service and upon providing proof of purchase by providing a receipt.

As of February 1, 2014, the Company will give each employee with at least six (6) months of service up to one hundred thirty-five ($135.00) dollars for safety shoes upon proof of purchase by providing one submission for each year of the contract.

New employees will be given one hundred thirty-five ($135.00) dollars upon completion of six (6) months of service and upon providing proof of purchase by providing a receipt.

6.    A local union official will be a member of the Safety Committee.  Union officials will be assigned on a rotating basis.

## SAFETY RULES AND PROCEDURE

1. Report all injuries, no matter how slight, to your supervisor immediately before going to First Aid. Failure to do so may result in disciplinary action.

2. Wear safety equipment, such as goggles, gloves, helmets, etc. if your job requires the use of such equipment. Safety shoes are mandatory plant-wide. Hearing protection must be worn in designated areas. Long, loose hair can be caught in a machine or be attracted by static electricity. Headbands, hairnets or other restraining devises must be used. Your supervisor will tell you how to get such equipment.

3. Observe and obey all danger signs and warnings.

4. Do not wear loose fitting or torn clothing, finger rings or loose jewelry while working around or on machinery.

5. Do not pass under raised stackers, pre-feeders, material handling trucks or materials at any time unless properly secured.

6. Do not, under any circumstances, pass over, under or sit between railroad cars or tractor trailer trucks (except drivers).

7. Horseplay is not allowed in the plant.

8. Do not use an air hose to clean your clothing or blow compressed air on a fellow employee.

9. Eye Protection - Your eyes are one of your most valuable possessions. We cannot at any cost replace an eye if you should lose it on the job. Therefore, all employees, office personnel and visitors will be required to wear approved eye protection in all manufacturing areas of the plant. Safety glasses will be available from the supervisors (see Eye Protection Policy for further details). Goggles must be worn when performing the following jobs:
   A. Grinding
   B. Overhead Scraping
   C. Chipping Ink or Glue
   D. Welding or Cutting (Operator and Helper)
   E. Operating Electric Drills, Drill Presses, Sander and Electric Saws
   F. Handling Hazardous Chemicals
   G. Cleaning With Compressed Air or Steam
   H. Hand Strapping

10. It is also recommended that goggles be worn while doing the following jobs:
    A. Regularly Scheduled Machine Clean ups (Entire Crew)

11. Report to your supervisor any machinery, tools, equipment or conditions which appear to you to be unsafe, including broken or missing guards.

34

12. Do not, under any circumstances operate a power truck or any other machinery unless you are authorized to do so by your supervisor.

13. ONLY AUTHORIZED PERSONNEL MAY OPERATE ELECTRICALLY DRIVEN EQUIPMENT. SPECIAL SAFETY RULES APPLY.

14. NEWTOWN'S LOCKOUT/TAG OUT/TRY PROGRAM MUST BE FOLLOWED AT ALL TIMES.

15. OBSERVE PLANT SMOKING AND FIRE REGULATIONS.

16. BEFORE WORKING ON STEAM, AIR, WATER OR ELECTRICAL LINES, CONSULT YOUR SUPERVISOR. SPECIAL SAFETY RULES APPLY.

17. CROSS CONVEYORS ONLY AT DESIGNATED POINTS. DO NOT WALK ON CONVEYOR ROLLERS.

18. When cleaning any machine, be sure that it is shut down and all safety features are set. Use extra precautions when working near nip points. Safety rules cannot cover all the ways in which you might get hurt.

19. Corrugators wooden pallets will not be lifted unless you have help.

20. Do not push a full roll unless you use the roll pusher. If the roll pusher does not work, notify you supervisor. If the roll pusher breaks, get help pushing the roll.

21. Gloves - Stanley knives are the only approved knives to be used in the plant and used in conjunction with a safety glove on the opposite hand.

22. Do not block fire protection equipment or doors.

23. If you are taking prescription drugs that may affect your work in any way, report this to your supervisor.

24. Do not climb or walk on stacked materials.

25. Never leave a running machine unattended. All equipment and tools must be properly stored when not in use.

26. Never put your hand into a machine that is running.

27. Only assigned maintenance personnel are allowed to make repairs on electrical equipment.

28. Do not climb or walk through machinery as a shortcut.

29. Ladders and scaffolds must be made secure and safe before using.

30.   All employees will be responsible for maintaining good housekeeping in their work areas.

31.   Hazardous chemicals will be stored in well marked containers.

32.   Employees handling or transporting cutting dies are required to wear special protective gloves.

## PLANT VEHICLES - (FORK TRUCKS)

1.   Vehicles in the plant shall be driven by authorized and qualified drivers only.

2.   No riders are permitted on vehicles not specifically equipped for riders.  Do not ride on forks or lift trucks.

3.   Stunt driving and horseplay are prohibited.

4.   When lift trucks are traveling, they should travel backwards except when picking up or stacking loads, when empty and gate is fully extended with blades or bucket low, when loads are not impairing drivers' visibility.

5.   Blow horn before entering aisles, doorways, or corners.

6.   Drive at a safe speed at all times.

7.   Established traffic regulations shall be observed at all times.

8.   Do not exceed lift truck load limits

9.   Do not allow anyone near any part of truck or load when truck is in use.

10.  Drivers are responsible for cleaning up oil and water spills.  Clean up as soon as possible.

11.  Do not stack loads that do not have proper bottom and binding sheets or that cannot be taken down safely.

12.  Do not stack loads more than three high.

13.  Do not stack loads more than one high on corners or two high by aisles and machines.

14.  All loads must be level before stacking.

15.  Lift trucks will not be left running while unattended.

16.  Vehicles will maintain a safe distance from other vehicles and be kept under positive control at all times.

17.  Any spilled loads will be picked up immediately.

18.  Do not change anything on lift trucks that govern speed.

19.  Trailers loaded with roll stock must have a tractor under them.

20.  Rolls trucks must carry roll stock in vertical position when transporting.

21.    Before leaving their vehicle, drivers must:

- Park in designated area or park sheets
- Lower load to the ground
- Place controls in neutral or park
- Set parking brake
- Shut off power or key

22.    Review PM checklist for the lift truck at the start of the shift.  Vehicles found unsafe should be taken out of service until repaired.

23.    Seat belts must be worn when operating a fork truck.

24.    All trucks must stop at all intersections.

## EYE PROTECTION POLICY

I.    **PURPOSE**

The purpose of this Eye protection Policy is to assure that proper personal protective equipment is used by all plant personnel, and all plant visitors while on the manufacturing floor.  By following this policy, the potential for eye injury due to dust, particulate matter and liquids will be reduced.

II.    **SCOPE**

A.    This policy is applicable to all persons regardless of professional affiliation.

B.    This policy is applicable while on the manufacturing floor.

C.    It is the responsibility of each supervisor to assure that employees observe this policy.

D.    It is the responsibility of whoever a visitor is seeing to assure this policy is observed.

III.    **POLICY**

A.    All persons will be required to wear safety glasses while on the manufacturing floor.

B.    Plant employees will be provided appropriate safety glasses during their employment.

**Non-Prescription Glasses:** Glasses will be issued through your supervisor. Employees will be issued glasses on an as needed basis and required to sign notice of their issue.  If replacement glasses are needed due to damage, an exchange will be required.  If replacement glasses are due to loss, one additional

38

pair per year will be provided. Employees will be charged for any additional pairs.

**Prescription Glasses:** Rand-Whitney Container LLC has secured the services of an outside supplier to provide prescription eyeglasses for employees.

Rand-Whitney Container LLC will provide the following:

1.    Frame selection and fitting
2.    Prescription lenses
3.    Side shields
4.    $25.00 towards frame purchase

The employee is responsible for the following:

1.    New eyeglass prescription
2.    Any charges in excess of the above

If an employee has a prescription change, Rand-Whitney Container LLC will provide new lenses, limited to one change per plan year February 1 to February 1.

If an employee damages glasses at work, Rand-Whitney Container LLC will provide one replacement pair per year. Exchange will be required. Replacement and/or exchange will not take place if due to neglect. Employees will be responsible for all other replacement charges.

If an employee loses glasses he/she will be responsible for entire cost of replacement.

C.    All new hires are required to purchase prescription safety glasses as described above. After completing the 120 days probationary period, the amount of the prescription glasses will be reimbursed as described above.

D.    If an employee comes to work without safety glasses, he/she will be issued a pair of visitor glasses to complete his/her shift. If any employee prefers to retrieve his/her own glasses, he/she will be charged with an occurrence as described in the Attendance Policy.

IV.    **DEFINITIONS**

A.    Manufacturing floor: Everything except front offices, locker room and cafeteria.

B.    Safety Glasses: Glasses meeting ANSI standards for industrial environment.

39

## PLANT RULES

1.  **Reporting for Duty**

    A.  Each employee must be at his/her station, ready for work, at the scheduled starting time of his/her shift and must remain there until the scheduled quitting time, or until properly relieved, which may include overtime.

    B.  Each employee must remain at his/her station during his/her shift and not visit other parts of the plant except in the line of duty or by permission of his/her supervisor.

2.  **Attendance Policy and Guide**

I.  **PURPOSE**

    In order for Rand-Whitney to meet its customer requirements and maintain a competitive position in the market, it is essential that an employee be at work on time. The purpose of this guide is to outline and define the Company's objectives concerning attendance and the methods to be used in order to attain these objectives.

    Absence from work as defined below is deemed as needed by the following circumstances: sickness, family illness, personal and family medical needs. Time off to extend vacation time, avoid work assignment, create work slowdown, or create a chronic pattern of absence (ex. every Monday in fall) may be subject to termination. This type of problem hurts all employees.

II.  **DEFINITIONS**

    A.  **CALL-IN**
        All employees who will be absent are expected to notify their supervisor one hour before the start of their scheduled shift. Telephone (203) 270-4026 or (203) 270-4034. If the employee leaves a message on the Company's voicemail system, they must follow-up and speak with their supervisor within one hour of the start of their shift.

    B.  **ABSENCE FROM WORK**

        Where an employee loses any type of time from a work day. Each work day is individual to itself. Absence from work includes:

        1.  **LATENESS** - Where an employee punches his/her time card past the start of his/her scheduled shift (this would include scheduled overtime) provided the employee punches in within three (3) hours of the start of his/her scheduled shift. Employees who punch in more than three (3) hours after the start of their scheduled shift shall have such occurrence treated as an Excessive Lateness Violation and shall not be put to work for the day.

40

    2.    **LEAVE EARLY** - When an employee leaves work, after notifying supervision, prior to the end of his/her scheduled shift.

    3.    **LEAVE AND RETURN** - When an employee leaves work after notifying supervision, during his/her scheduled shift and returns within two and one-half (2-1/2) hours. If an employee leaves during his/her shift for the purpose of a scheduled doctor's appointment, said employee may return with proof of said appointment to resume work without point penalty.

    4.    **ABSENCE** - When an employee is absent from work for his/her entire scheduled shift.

C.    **UNEXCUSED ABSENCE WITHOUT NOTIFICATION**

Where a person is absent without notification to the Company, or if notification of absence occurs more than three (3) hours after the start of the employee's shift.

D.    **DOCUMENTED ABSENCE**

Where a person who has been absent for three (3) or more days (and called in the prescribed manner) must bring in a doctor's note indicating what the sickness was and that the doctor was seen during the period of the absence.

E.    **PUNCH VIOLATION**

Where an employee fails to punch in, or punch in under five (5) minutes late. Failure to punch only applies in situations where it is known that the employee is at work on time. Employees deliberately using this violation to avoid points or falsify time and attendance records could be charged with a more serious offense.

F.    **INDUSTRIAL ACCIDENT**

When an employee is hurt and is absent as a result of an industrial accident at Rand-Whitney, he/she will not be charged with an absence.

G.    **TIME PERIODS**

The time period for this program will be twelve (12) rolling months, i.e. at the 13th month, the employee's first month will be dropped.

III.    **PROCEDURE**

A.    Records of absences and lateness will be maintained on all employees.

41

B.      Each occurrence will have a point value:

|   |   |   |
|---|---|---|
| 1. | Call in Violation | 5 Points |
| 2. | Late, Leave Early, Leave and Return | 10 Points |
| 3. | Entire Day Absent | 15 points |
| 4. | Unexcused absence without notification (three (3) no notifications in any 1 year period is a termination offense) (credits can not be used against unexcused absence |  |
| 5. | Document absence | 10 Points |
| 6. | Punch violations (1st two (2) violations during each contract year does not accrue points) | 10 Points |
| 7. | Perfect Attendance - For each month of perfect attendance an employee will receive | 10 Point Deduction |

For the first three occurrences of any of the above violations (except unexcused absence without notification) employees will not accrue points.

## IV.   METHOD

Based on each employee's behavior during a twelve (12) month period, the following will take place.

A.      When an employee reaches twenty-five (25) points, a counseling session will be conducted between the employee and his/her supervisor. Written record will be made with copy to the Union. A Union representative will be present.

B.      When an employee reaches fifty (50) Points, a counseling session will be conducted between employee, his/her supervisor, and the Manufacturing Manager. Written record will be made with copy to Union. A union representative will be present.

C.      When an employee reaches seventy-five (75) Points, a final counseling session will be conducted between the employee, his/her supervisor, and the Manufacturing Manager and the Company General Manager and the employee shall be subject to a time served disciplinary suspension. A written record will be made with a copy to the Union. A union representative will be present.

D.      When an employee reaches one hundred (100) Points, the employee will be terminated.

42

E.   **PERFECT ATTENDANCE** will be rewarded in three (3) ways:

1.   When an employee has any Points, those Points can be reduced by ten (10) Points by having perfect attendance for one (1) month. Each succeeding month would continue to reduce his/her record by ten (10) Points. Employees will be allowed to bank ten (10) Points. Employees will be able to bank up to a maximum of fifty (50) negative points by having continuous months of perfect attendance.

2.   For each month an employee does not have any Points, that employee will be awarded two (2) hours of straight time which will be paid at the end of the year.

Since it is the intention of this provision to only reward **PERFECT ATTENDANCE**, the occurrence of any incident including credit days, five (5) minutes late, lateness or punch violations, will eliminate the employee from this reward during the month of the occurrence.

3.   When an employee has a full year of **PERFECT ATTENDANCE** there will be $250.00 Savings Bond awarded to such an employee.

F.   In the event of adverse weather resulting in the declaration of a "National Weather Emergency for Connecticut" by the National Weather Service, no attendance penalties will apply to employees who elect not to come to work for an affected shift or leave early in anticipation of difficult driving conditions. The employee is still responsible for notifying the foreman in either case. The Rand-Whitney weather line telephone number is (203) 270-4088.

G.   The Company will provide the Union with weekly reports on employee's attendance points. Employees will receive discipline pursuant to the Attendance Policy in a reasonable period of time.

H.   Employees who are scheduled to report for work before their normal shift starting time shall be given the same consideration for attendance point avoidance for weather and/or traffic reasons that employees are given who report at their regularly scheduled start up times.

3.   **Time Cards**

A.   Each employee must enter their Personal Clock ID# at the beginning and ending of their shift, or any other time they leave the plant premises, such as lunch time.

B.   No employee shall enter the Personal Clock ID# of another employee under any circumstances.

43

C.  An employee must not enter their Personal Clock ID# more than (1) minute before their shift and must not enter their Personal Clock ID# more than one (1) minute after the end of their shift.

4.  **Paychecks**

An employee may not secure his/her paycheck except at the scheduled time. No one may secure an employee's paycheck without written authorization from the employee to do so.

Employees will be paid on a bi-weekly payroll, beginning on the first payroll in April 2012. Pay days will be on Fridays unless not available in a holiday week or circumstances beyond the Company's control.

5.  **Change in Shifts**

Employees may not exchange shifts except with the prior approval of both supervisors.

6.  **Address-Family Status**

A.  Many times there is a critical need to have information about an employee and/or his/her family. Therefore, if an employee changes his/her address or telephone number, he/she must report the change immediately to the Personnel Office.

B.  If an employee's marital status or number of dependents change, he/she must report the change immediately to the Personnel Office.

7.  **Cause for Discharge**

Each employee is required to work efficiently, and conduct himself/herself properly. Causes for discharge include, but are not limited to, the following:

A.  Violating plant rules or safety rules and practices.

B.  The use, sale or possession of alcohol, drugs, or illegal substances, or being impaired by any of these, is prohibited on Company property.

C.  Reporting for duty apparently under the influence of intoxicants.

D.  Smoking in restricted area.

E.  Being insubordinate or disobedient.

F.  Damaging or removing the Company's or another person's property.

G.  Neglecting duty or failing to maintain work standards.

44

H.    Using abusive or threatening language to anyone while on duty.

I.    Fighting or disorderly conduct.

J.    Offering or taking a bribe of any kind in connection with work.

K.    Sleeping on duty.

L.    Participating in practical jokes or pranks which may have serious results.

M.    Reading on duty, except when required by work.

N.    Holding or limiting production.

O.    Entering the Personal Clock ID# of another employee or falsifying any time card or other record.

P.    Excessive absences or tardiness.

Q.    Gambling on Company property.

R.    Leaving the plant while on duty without the prior permission of his/her supervisor or the plant superintendent.

S.    Employees will be disciplined for the improper use of the paging system.

T.    Using cell phones on company time unless authorized by management.

Disciplinary actions are subject to grievance and arbitration procedures.

# EXHIBIT B

COLLECTIVE BARGAINING AGREEMENT

-between-

RAND-WHITNEY CONTAINER LLC
Newtown, CT

-and-

UNITED STEELWORKERS
AFL-CIO-CLC
LOCAL UNION NO. 4-0902

DATED:            February 1, 2015
TERMINATION:      February 1, 2018

# TABLE OF CONTENTS

**ARTICLE**                                                    **PAGE NUMBER**

**ARTICLE I**        RECOGNITION AND REPRESENTATION ...................................1

    Section 1        Recognition................................................................1
    Section 2        Membership...............................................................1
    Section 3        Dues Deduction.........................................................2
    Section 4        Union Committee.......................................................2
    Section 5        Attendance at Union Conventions.............................2
    Section 6        Local Elections.........................................................2

**ARTICLE II**       OPERATION OF THE BUSINESS.....................................3

**ARTICLE III**      HOURS OF WORK AND OVERTIME ...............................3

    Section 1        Work Day and Work Week ........................................3
    Section 2        Opportunity for Overtime and Overtime Roster........4
    Section 3        Mandatory Overtime.................................................5
    Section 4        Rest Periods..............................................................6
    Section 5        Premium Pay.............................................................6
    Section 6        Rate for Temporary Assignments.............................7
    Section 7        Call Time..................................................................7
    Section 8        Report Time..............................................................7
    Section 9        Non-Traditional Work Schedules.............................8

**ARTICLE IV**       HOLIDAYS......................................................................8

    Section 1        Recognized Holidays................................................8
    Section 2        Hours Worked On Holidays......................................9
    Section 3        Holiday Allowance...................................................9

**ARTICLE V**        PAID TIME OFF............................................................10

**ARTICLE VI**       SENIORITY...................................................................12

    Section 1        Types of Seniority...................................................12
    Section 2        Promotions and Demotions.....................................12
    Section 3        Lines of Progression...............................................12
    Section 4        Transfers..................................................................12
    Section 5        Layoffs....................................................................13
    Section 6        Bumping...................................................................14
    Section 7        Probationary Employees.........................................15

ARTICLE VII   WAGES ......................................................................................15

ARTICLE VIII   FUNERAL LEAVE ......................................................................15

ARTICLE IX   JURY LEAVE ..............................................................................16

ARTICLE X   CONTINUITY OF OPERATIONS .............................................16

ARTICLE XI   LEAVES OF ABSENCE..............................................................17

  Section 1  General.......................................................................................17
  Section 2  Military Duty .............................................................................18

ARTICLE XII   ADJUSTMENT OF GRIEVANCES .........................................18

ARTICLE XIII   ARBITRATION...........................................................................19

ARTICLE XIV   PENSION ....................................................................................19

ARTICLE XV   GENERAL ..................................................................................20

  Section 1  Bulletin Boards.........................................................................20
  Section 2  Non-Discrimination ...................................................................20
  Section 3  Insurance....................................................................................20
  Section 4  Job Progression .........................................................................20
  Section 5  Discharge and Termination........................................................20
  Section 6  Disciplinary Offenses ...............................................................21
  Section 7  Supervisors................................................................................21
  Section 8  Seniority List ............................................................................21
  Section 9  401(K) Plan................................................................................21
  Section 10  Accident Reports .....................................................................21
  Section 11  Cafeteria 125 Plan ...................................................................21
  Section 12  Summer Help ...........................................................................22
  Section 13  Fulfillment Operation ..............................................................22

ARTICLE XVI   SEPARABILITY ........................................................................22

ARTICLE XVII   COMPLETENESS OF AGREEMENT........................................23

ARTICLE XVIII   TERM OF AGREEMENT ...........................................................23

EXHIBIT A   RATE SCHEDULE .....................................................................25

iii

**EXHIBIT B**         **INSURANCE** ...............................................................................26

  Section 1 Health Insurance .................................................................26
  Section 2 Sickness and Accident Insurance.....................................27
  Section 3 Life Insurance ......................................................................27

**EXHIBIT C**         **LINES OF PROGRESSION**.........................................................27

**EXHIBIT D**         **LINES OF PROGRESSION GUIDELINES FOR THE**
        **MAINTENANCE DEPARTMENT** .......................................28

**EXHIBIT E**         **SUPPLEMENTAL MEMORANDUM OF AGREEMENT** ...............29

**SAFETY RULES AND PROCEDURE** .........................................................30

**PLANT VEHICLES - (FORK TRUCKS)**.....................................................32

**EYE PROTECTION POLICY**......................................................................33

**PLANT RULES** ..........................................................................................35

**ATTENDANCE POLICY AND GUIDE** ......................................................35

**RULES OF CONDUCT** ..............................................................................37

## COLLECTIVE BARGAINING AGREEMENT

This Agreement is by and between Rand-Whitney Container LLC, for its container plant located in Newtown, Connecticut (hereinafter called the "Company") and the United Steel, Paper and International Union, Forestry, Rubber, Manufacturing, Allied Industrial and Service Workers AFL-CIO-CLC, known in short as "United Steelworkers" or "USW," referred to hereinafter as the "Union," on behalf of itself and its Local Union No. 4-0902.

The parties to this Agreement desire to establish and maintain mutual understanding, mutual welfare, and cooperation that will promote to the fullest the safety of the employees, economy of operation, quality and quantity of output, cleanliness of plant and premises, and the protection of property, and it is recognized by this Agreement to be the duty of the Company, the employees and the Union to cooperate fully for the advancement of these conditions, looking toward a profitable operation.

## ARTICLE I          RECOGNITION AND REPRESENTATION
**Section 1          Recognition**

The Company recognizes the Union for the purpose of collective bargaining as the exclusive representative of the unit comprising its production and maintenance employees and Truck Drivers at its corrugated container plant in Newtown, Connecticut, as certified by the National Labor Relations Board in its case No. 2-RC-15381, dated August 20, 1970. Office and clerical employees, timekeepers, professional employees, guards, watchmen and supervisors as defined in Section 2(II) of the Labor-Management Relations Act of 1947, as amended, are excluded.  The Union agrees not to solicit nor accept such excluded employees for membership in the Union.  The membership of Local 4-0902 will be composed exclusively of employees of the Company.

**Section 2          Membership**

Subject to the provision of the Labor Management Relations Act, 1947, all new Employees and present employees (except for temporary employees who shall not be employed for more than ninety (90) days) who have heretofore become members of the Union shall, as a condition of employment, be members of the Union not later than the thirtieth (30th) calendar day following the beginning of such employment or the effective date of this Agreement, whichever shall be later, and as a further condition of employment, shall maintain such membership in good standing during the life of this Agreement.

1

**Section 3      Dues Deduction**

The Company will check off monthly dues or service charges, including, where applicable, initiation fees and assessments, each in amounts as designated by the Union's International Secretary-Treasurer, effective upon receipt of individually signed voluntary check off authorization cards.  The Company shall, within ten (10) days, remit any and all amounts so deducted to the Union's International Secretary-Treasurer, Five Gateway Center, Pittsburgh, Pennsylvania 15222, with a completed summary of USW Form R-115 or its equivalent.

**Section 4      Union Committee**

The Union shall keep on file with the Plant Manager the name, addresses and telephone numbers of the duly elected and authorized members of the Union Bargaining Committee, Union Officers and Stewards.  As far as the Company is concerned, the Union Bargaining Committee shall be limited to five (5) members.  Whenever these members are required to attend a meeting called by the Company, or if called by the Union and approved by the Company, they shall be paid for time lost from scheduled work at the applicable rate, but never more than to the end of their respective shift. During contract negotiation time, the Union Bargaining Committee may consist of not more than five (5) members.  The members of the Committee shall not be expected to work on any day in which they are engaged in contract negotiations with the Company.

**Section 5      Attendance at Union Conventions**

The Company shall permit employees to be absent from work in order to permit such employees to attend regularly scheduled International Union Conventions or regularly scheduled Regional International Union Meetings, and the officers of the Local Union and persons to be sworn in to the Local Union shall be permitted to attend the Local meetings when the same cannot be held outside of working hours.  In all such instances, however, the employees involved shall be required to give at least three (3) days notice to the Company of such attendance in order to give the Company a reasonable opportunity to arrange for a replacement.  In no event shall the attendance at any of such meetings be in such numbers as would interfere with production in the plant.

**Section 6      Local Elections**

Scheduling problems that conflict with the Union's local elections every two (2) years

will be discussed between the parties with the intent of arriving at a mutually convenient accommodation for each party. The parties, however, recognize the importance of meeting customer requirements and the mutual accommodation as set forth above will, in all cases, insure that these requirements are met.

## ARTICLE II        OPERATION OF THE BUSINESS

Except as expressly limited by this Agreement, or any written amendments hereto, the Company retains the sole right to manage its business and direct the working force, including, but not limited to, the right to relocate, build or expand its plant, machines and equipment; to decide the products to be manufactured, the services to be rendered, the schedules of production, the process of manufacturing or assembling, together with all designing, engineering and control of raw materials, semi-manufactured and finished parts, which may be incorporated in the Company's products; to introduce technological innovations; to establish and enforce rules not in conflict with the Agreement; to create, change, combine or eliminate jobs; and to hire, transfer, layoff, promote, demote, discipline, suspend or discharge for cause.

This Agreement shall not limit the Company's right to expand or curtail its operations, to shut down completely, or to close, merge or consolidate departments, provided, however, that the Company shall give reasonable prior notice to the Union and shall negotiate with the Union the status of the employees affected by such actions. The enumeration of the above management rights shall not be deemed to exclude other rights of the same general character not enumerated herein, and all rights held by the Company, except as expressly limited by other provisions of this Agreement. A violation of this Agreement claimed by the Union to exist as a result of the exercise of these rights by the Company shall be subject to the grievance and arbitration procedure of this Agreement.

## ARTICLE III        HOURS OF WORK AND OVERTIME

**Section 1        Work Day and Work Week**

a.        When working a traditional/standard work week schedule, the traditional/standard work day shall be eight (8) hours, and the traditional/standard work week shall be forty (40) hours. The traditional/standard work week shall begin at 7:00 a.m. day one (1) and end 7:00 a.m. the following day one (1). When the daily or weekly work period is extended by the Company,

employees working such extended work periods will be eligible for premium pay as hereinafter provided.

        b.      When working a traditional/standard work week schedule, employees working in excess of eight (8) hours in a daily work period or in excess of forty (40) hours in a work week period will be paid time and one-half for the hours worked in excess of eight (8) hours on a daily basis or in excess of forty (40) hours on a weekly basis, whichever is greater, but not both, since overtime shall not be paid on overtime. During said schedule, double time will be paid after twelve (12) hours of work.

        c.      Traditional/standard shift hours:

             Shift 1:      7:00 a.m. - 3:00 p.m.

             Shift 2:      3:00 p.m. - 11:00 p.m.

             Shift 3:      11:00 p.m. - 7:00 a.m.

        d.      When working a traditional/standard work week schedule, hours worked between 11:00 p.m. the seventh (7th) day and 7:00 a.m. day one (1) will be considered day one (1) hours for purposes (straight time), for any third (3rd) shift employees that begin their work on the seventh (7th) day.

        e.      Employees shall be entitled to a twenty (20) minute paid lunch.

        f.      The time for the start and finish of an employee's shift may be changed by the Company as necessary to meet production and service requirements. Notification of changes will be given to the employee before the end of his or her regular schedule shift preceding the change or a minimum of twelve (12) hours prior to the start of the new shift.

        g.      An Employee is entitled to ten (10) hours off between shifts.

**Section 2**        **Opportunity for Overtime and Overtime Roster**

        a.      Opportunity for overtime will first be offered to the employee on the job. If an employee works four (4) hours in a job classification, the employee will be considered part of that job classification for purposes of overtime for that day.

        b.      If not obtained in this manner, overtime will next be offered to qualified employees, on shift, in the same classification in order of seniority. If not obtained through the above procedures, it will then be offered to the senior qualified member in the department with the exception of the department helper overtime.

4

For sixth (6th) day overtime, it will be offered to the senior qualified employee in the department, on shift, with the exception of department helper overtime.

c.      Overtime will be paid at the job classification rate of employee or the rate of the job performed, whichever is higher.

d.      When overtime is required in the classification of department helper in any department, it will, of course, be first offered to the helpers in the department and then, if we cannot obtain enough employees to fill our overtime needs, we will then offer the overtime opportunity to the other employees in that department on a roster basis designed to equalize the opportunity for overtime as department helpers.   The roster will be maintained with the following notations:

      W      Employee accepted overtime and worked

      R       Refused overtime opportunity

      N/A   Not available

e.      The maintaining of the roster will not mean that the Company will attempt to equalize the number of hours worked by all employees over a given period.  The overtime roster will be posted daily.

f.      If all employees refuse overtime, it is the responsibility of the employee on the job to accept it.

g.      Employees will be notified that overtime is available one (1) hour before the end of their respective shift.  However, if a situation arises that must be taken care of, the employee on the job will be expected to perform the work.

h.      An employee who refuses overtime on three (3) consecutive occasions will be required to inform the Company, in writing, of their intent to accept future overtime opportunities.  If the employee fails to notify the Company, that employee will be dropped from the overtime roster.

i.      If it becomes necessary to cover an overtime assignment outside a department, available senior qualified employees will be asked to work such assignment.  The seniority determination will be on the basis of plant seniority.  If the vacancy is not filled as noted above, the available junior qualified employee will be required to work the overtime assignment.

**Section 3      Mandatory Overtime**

a.      Union will be notified by fourth (4th) day, at the end of their shift, for sixth (6th) day work.

b.       Where practical, all employees will be notified one (1) hour prior to the end of their shift if they are to work mandatory overtime.

c.       When an employee completes his or her regular eight (8) hour shift and is unable to work overtime, the employee will not be marked as leaving early on his or her attendance card, if excused by a supervisor.

d.       The above does not apply in emergency situations such as: meeting first load requirements, machine breakdowns, heavy maintenance schedules, and absent machine crew members.

e.       No mandatory overtime in excess of twelve (12) hours per day.  Employees who desire to work over twelve (12) hours per day shall only be able to do so at the direction of the Company.

f.       In order to alleviate excessive overtime requirements on a particular machine, the Company will schedule other qualified crews to share the needed overtime work.


## Section 4       Rest Periods

a.       The employees covered by this Agreement, who are scheduled to work eight (8) hours or less shall be entitled to a ten (10) minutes rest period.

b.       The employees covered by this Agreement who are scheduled to work more than eight (8) hours shall be entitled to an additional ten (10) minutes rest period.

c.       The rest periods will be scheduled by the Company.  However, it is the Company's intent to schedule them as near the middle of each half a shift as practicable.


## Section 5       Premium Pay

a.       When working a traditional/standard work week schedule, one and one-half the regular rates of pay will be paid for work performed on the sixth (6th) day, provided the employee has worked all the hours scheduled during the work week and double the regular rates of pay for work performed on the seventh (7th) day, provided, however, the employee has worked all the hours scheduled during the work week and that if two (2) or more premium pay sections apply, the affected employee will be paid only under the one which will pay the employee the greatest amount and not under more than one (1) provision.  For the purpose of determining eligibility for the sixth (6th) and seventh (7th) day premium, a person not at work due to holiday, PTO or jury duty shall be deemed as having fulfilled the requirement that he/she

6

works all scheduled hours during the week to earn the premium(s). A day, for the purposes of computing the sixth (6th) and seventh (7th) day premium, shall be calculated as the twenty-four (24) hour period governed by the scheduled starting time for a new work week by work assignment.

b.  Should the Company introduce a non-traditional shift schedule (for example, a ten (10) hour per day, four (4) days per week schedule), all hours in excess of the scheduled work day will be paid at time and one-half. The Company will meet with the Union membership to discuss the impact of such schedule on other pay provisions set forth in the labor agreement.

**Section 6      Rate for Temporary Assignments**

If an employee works on a job paying a higher rate than his or her own, the employee shall receive the higher rate for the time worked on such higher rated job. When the Company temporarily assigns an employee to a job paying a lower rate than his or her regular job, the employee shall be paid his or her regular rate. An employee transferred to a lower rated job on an optional basis shall, if the employee accepts the transfer, be paid at the rate applicable to the job performed.

**Section 7      Call Time**

If an employee is called to work at a time other than his or her scheduled reporting time, and after having left the plant premises, the employee shall be allowed a minimum of four (4) hours straight time or time and one-half the actual hours worked, whichever is greater. Call time premium pay shall not apply in those instances in which an employee is either scheduled to report prior to the normal starting time or is called in and continues to work into his or her normal shift hours. In these cases the employee will receive the applicable overtime rate.

**Section 8      Report Time**

An employee reporting for work at his or her scheduled time shall be guaranteed four (4) hours work at his or her regular straight time rate or the applicable premium rate, except in case of storm, flood, accident, power breakdown, or other causes beyond the control of the Company, or unless the employee has been notified not to report by posting of a notice on the bulletin board  prior to the end of his or her shift on the preceding day, or by messenger or

7

telephone at the employee's residence (as listed on the Company's records) at least one (1) hour prior to the beginning of the employee's regular shift. The Company, in its discretion, may either pay for the guaranteed four (4) hours or may assign the employee to any work in the plant which the Company desires to have performed.

**Section 9    Non-Traditional Work Schedules**

The Company may, for business reasons, implement non-traditional work schedules in specific departments or plant-wide as required.

A non-traditional work schedule is one that differs from the regular eight (8) hour day, forty (40) hour work week. The work week begins on the day employees are assigned a non-traditional schedule and continues through seven (7) consecutive calendar days. The work day begins at the start time an employee is assigned a non-traditional shift and continues through twenty-four (24) consecutive hours. The Company will give the Union thirty (30) day notice prior to implementing a non-traditional work schedule.

When overtime is scheduled, time and one-half will be paid for all time worked in excess of scheduled hours per day, or for all hours worked in excess of forty (40) hours in one week. There shall be no duplication of overtime or premium pay and payments pursuant to this Section shall be credited against overtime or premium pay on any other basis.

**ARTICLE IV        HOLIDAYS**

**Section 1    Recognized Holidays**

a.    The following will be recognized as holidays (7:00 a.m. on the named day to 7:00 a.m. on the day immediately following):

| | |
|---|---|
| NEW YEAR'S DAY | COLUMBUS DAY |
| PRESIDENT'S DAY | THANKSGIVING DAY |
| MEMORIAL DAY | DAY AFTER THANKSGIVING |
| INDEPENDENCE DAY | CHRISTMAS EVE DAY |
| LABOR DAY | CHRISTMAS DAY |

b.    The hours of commencing and ending as set forth in the above list, may be varied by mutual agreement of the Company and the Union, and the specified hours of commencing and ending will be adjusted to coincide with the regular hours of changing shifts.

**Section 2        Hours Worked on Holidays**

    a.    Hours worked on Christmas Day, New Year's Day, Independence Day, Labor Day, and Thanksgiving Day, shall be paid at double time. Other holidays set forth in the above list shall be paid at time and one-half. If two (2) or more premium pay sections apply, the affected employee will be paid under the one which will pay him/her the greatest amount and not under more than one (1) provision.

    b.    The holiday premium shall not apply to the first shift following the holiday should an employee be asked to begin the shift earlier than 7:00 a.m., provided, however, the holiday premiums shall apply to any hours worked on that shift which are more than two (2) hours prior to the scheduled starting time of that shift.

**Section 3        Holiday Allowance**

    a.    A holiday allowance equal to eight (8) times their basic hourly rates will be given for the foregoing holidays to all employees who qualify therefore under both the following conditions.

    1.    Continuous employment by the Company for at least thirty (30) calendar days prior to the holiday, and;

    2.    The employee shall have worked the employee's last scheduled shift before the holiday, the employees first scheduled shift after the holiday, and the holiday, if the employee has agreed or is scheduled to work on the day, unless the employees absence on these respective days has been occasioned by the following justifiable causes:

    (a)    Sickness of such a nature that the employee was unable to report for work or had to leave work early due to sickness. Proof of such sickness may be required.

    (b)    Sickness of a member of the employee's immediate family requiring the employee's presence. Proof of such sickness and requirement may be required.

    b.    If a listed holiday falls when an employee is away from his or her job, the employee shall receive the applicable holiday allowance after the employee returns to work, provided that the employee is otherwise qualified for such holiday allowance and such period of absence shall not have exceeded sixty (60) days. Payment under this provision shall be limited to two (2) holidays in any one period of absence.

9

## ARTICLE V        PAID TIME OFF

| (1) Length of Service | Length of PTO | PTO Pay % of 52 Weeks Earnings Next Preceding 12/31 |
|---|---|---|
| Less than 1 Year | Pro-Rated | |
| 1 year but less than 5 years | 12 days | 0.4% per day |
| 5 years but less than 10 years | 17 days | 0.4% per day |
| 10 years but less than 20 years | 22 days | 0.4% per day |
| 20 years or more | 27 days | 0.4% per day |

- PTO will be allotted on January 1 of each year following the employee's anniversary and vest at the rate of $1/12^{th}$ of the PTO allocation per month.

- In the first year of employment, an employee will be paid their PTO pay at their base hourly rate. In subsequent years they will be paid pursuant to the schedule above.

- Employees will be allowed to use PTO in one day at a time ("DAT") increments as follows:
  - If an employee has 12 or 17 PTO days, he/she will be able to use up to 7 of them as DATs.
  - If an employee has 22 or 27 PTO days, he/she will be able to use up to 12 of them as DATs.

- DATs must be requested at least 2 weeks in advance and will be scheduled only after full PTO weeks have been scheduled (in accordance with the procedures set forth in the collective bargaining agreement).

- All DAT requests are subject to the approval of the Company.

  (1)    The Company will pay two percent (2%) of W-2 earnings per week of PTO. In those cases where two percent (2%) does not equal forty (40) hours of pay, the Company will add the lost earnings to the W-2 due to plant shutdown, active military duty or National Guard/Reservist duty only, at the last rate of pay earned in the W-2 year, and then the Company will pay two percent (2%) of this amount per week of PTO not to exceed forty (40) hours of pay.

b.        Time lost as a direct result of accidental injury incurred while the employee was actually working on his or her job shall be counted in computing the 1,040 hours necessary to qualify him/her for a PTO on the first eligibility date following such accident. Time off as a

result of attending Union negotiations shall be considered in a like manner. Each full workday so lost shall be credited at eight (8) hours.

    c.    The PTO year shall extend from January 1st to December 31st. A PTO week shall be seven (7) consecutive days. The Company shall schedule each employee's PTO and shall administer the PTO program. Consistent with production requirements, preference will be given where practicable to the employee's plant seniority. The Company may close all or part of its operation in order to accomplish the PTO schedule. Accordingly, the Company reserves the right to schedule PTO shutdown(s) for up to two (2) weeks per year provided employees are given notice of such shutdown(s) by April 1.

    d.    Insofar as it is practicable, the Company will follow a procedure for scheduling PTO's which will allow employees to submit PTO requests by January 2 and will publish an approved PTO schedule by January 31. PTO requests submitted after January 15 of each year will be considered by the Company based upon available open dates and granted on a first come first serve basis, regardless of seniority. An employee failing to submit a PTO request, in accordance with the above, will take whatever PTO is available. The approved PTO schedule may be changed later to accommodate production schedules. In the event the Company decides to close the plant for the PTO period and some employees are required to work, their PTO's will be rescheduled. The Company will review the PTO schedule with a Union committee member before final posting.

    e.    The Company favors every eligible employee have his or her full PTO period as time off from work in addition to his or her PTO pay.

    f.    PTO may not be accumulated from year to year and are not transferable. Employees entitled to 12 or 17 PTO days may be paid out for up to 5 unused days at the end of each calendar year. Employees entitled to 22 or 27 PTO days, may be paid for up to 10 unused days at the end of each calendar year.

    g.    If a holiday falls during the time an employee is on PTO, the employee will be paid for the holiday in lieu of time off, provided the employee is qualified as stated in Article IV.

    h.    Employees will receive their PTO pay in the week in which the PTO occurs.

    i.    Employees hired by Rand-Whitney Container LLC on December 19, 1998, who were employed by the prior Company shall be given credit for one-half (½) of their total service with the prior Company and full credit for their Rand-Whitney service for the purpose of determining their PTO entitlement.

11

ARTICLE VI          SENIORITY

Section 1          Types of Seniority

Plant seniority dates from the time of the most recent hire.  Job seniority starts on the date the employee is classified in an occupation on a permanent basis.  Job seniority is accumulated in the current job and is senior to jobs below in the same job progression.

Section 2          Promotions and Demotions

If employees are to be promoted, demoted, the Company shall take into consideration seniority, fitness, and ability; and when all the factors that constitute fitness and ability are relatively equal, seniority shall prevail.  Seniority shall be construed to mean job seniority for purposes of promotion and demotion, except when the employee is in the bottom job of progression.  Seniority need not apply to temporary promotions not contemplated to exceed one (1) week.

Section 3          Lines of Progression

When a permanent vacancy exists in a line of progression, it shall first be offered to employees in the same classification on all shifts in order of seniority.  If not filled in this manner, the opportunity for promotion will be offered to senior employees in the next lower job in the line of progression.  In all cases, the junior qualified employee, as noted above, must progress to said permanent vacancy.

Section 4          Transfers

a.          An employee may transfer from his or her present job to the bottom job in a line of progression as provided hereafter.  Copies of Request for Transfer will be provided for the employee and for the Union, and the Union will be advised when the transfers are granted.  The employee should inform his or her supervisor of the job to which the employee desires to be transferred and fill out the transfer request forms.  The Company shall consider his or her request, taking into account his or her entire record, including the training and experience needed for the desired job.  The Company may give further tests to the employee if it deems them desirable.

b.          All job vacancies will be posted on the Company's website for five (5) days to enable all employees the opportunity to request transfer to such jobs.  A copy of the posting will

also be provided to a Union Steward..

    c.    If the request for transfer is denied, the Company will explain the reasons for this action to the employee and may make suggestion which will enable him/her to qualify for such transfer at a later date. If the request for transfer is to be granted, the employee's name will be placed on a waiting list for such job, with openings for that job being filled by the employee on the list with the most plant seniority.

    d.    After the employee is transferred, he/she shall retain his/her job seniority on the job from which he/she was transferred for a period of thirty (30) days, and such job seniority shall apply in the event of failure to qualify in his/her new job or his/her desire to return to the former job. In the event that an employee returns to his/her former job within the thirty (30) day period provided above, the time spent on the new job shall count as job seniority in the former job. An employee who voluntarily returns to his/her former job after a thirty (30) day period will revert to the Department Helper classification and will forfeit any bidding rights on any permanent job vacancy for twelve (12) consecutive months from date said employee returns to his/her former job. In the event the employee's new job is eliminated by reduction in force, or layoff, within six (6) months of their transfer, the employee may return to his/her prior job and the time spent on the new job shall count as job seniority in the former job.

    e.    An employee awarded a bid job paying the same as, or lower than, his/her former job, will forfeit all bidding rights for a period of six (6) months to any jobs paying lower than his/her former job.

    f.    The Company reserves the right, at its discretion, to re-assign general helpers to departments or operation as needed to balance shifts and/or to maintain manning requirements.

    g.    Employees may be temporarily transferred to another job and/or department, by reverse seniority, if qualified, for a period not to exceed ninety (90) days. Upon mutual agreement between the Company and the Union, this period may be extended for an additional thirty (30) days.

**Section 5**    **Layoffs**

    If an employee in the bottom job in a job progression is subject to layoff due to reduction in force, the employee may exercise his or her plant seniority to displace the employee with the least plant seniority in the job classification of Department Helper in any department.

13

**Section 6**     **Bumping**

a.     In the event of a reduction in force, shift or classification, expected to have a duration of at least two weeks, the employee affected will use one of the following alternatives:

1.     Will displace junior employee within same classification on same shift.

2.     If this move is not available, the employee will displace his/her junior employee in same classification on preferred shift.

3.     If this move is not available, the employee will displace his/her junior employee on preferred shift in the next job classification.

4.     In the event the first three alternatives are not available, Article VI, Section 5 (Layoffs) of the contract agreement will prevail.

5.     Fitness, ability to continue the function of the job, and seniority, will be considered in offering these procedures.

6.     In the event the employee's previous job is reopened within four (4) months of his/her transfer, which was due to a reduction in force, shift or classification, the employee will return to his/her prior job.

7.     The Union Committee and affected employee will be notified one (1) week in advance of job assignment changes.

b.     An employee laid off due to lack of work, who has been employed continuously by the Company for sixty (60) calendar days or more during his or her last period of employment, shall have the right to reinstatement without breaking continuous service when a vacancy occurs in a job which the employee is qualified to perform provided the employee reports to the Personnel Office of the Company in person or by letter not later than the 15th day of each month the layoff continues to signify his or her desire to return to work.   Right of reinstatement will be for a period of one (1) year, subject to the above conditions.   Length of continuous service shall be broken by:

1.     Voluntarily termination or quitting by an employee

2.     Discharge

3.     Layoff for more than twelve (12) months

4.     Fails to report within forty-eight (48) hours of recall from layoff after having been notified to do so by the Company at the employee's last address as shown on the Company's records.

14

**Section 7      Probationary Employees**

New employees shall be classified as probationary employees until they have been an employee of the Company for ninety (90) calendar days, (which period may be extended thirty (30) days upon notice to the Union) after which their plant seniority and employment continuity shall date back to the date of commencing work. The termination of employees with less than one hundred twenty (120) days of employment shall not be subject to the grievance or arbitration procedures.

**ARTICLE VII          WAGES (AND EXHIBIT "A" RATE SCHEDULE)**

a.      It is agreed that the negotiated rates of pay and job classifications set forth in Exhibit A, attached hereto are made a part hereof and shall be effective as shown.

b.      When a new job is created, or when there are substantial changes in the content of an existing job, the Company may set a temporary rate therefore; the regular rate and the effective date will be negotiated with the Union.

c.      Checker Loaders will be paid $2.50 per hour for time spent moving trailers.

**ARTICLE VIII          FUNERAL LEAVE**

a.      An employee with thirty (30) calendar days or more of plant seniority will be granted an excused funeral absence from scheduled work for three (3) calendar days, which must be used from the date of death until two (2) days after the date of the funeral, in the event of the death of his or her spouse, child or stepchild, grandchild, mother or stepmother, father or stepfather, grandmother or grandfather, sister or brother, father-in-law, mother-in-law, brother-in-law, and sister-in-law.

b.      An allowance of eight (8) hours pay per day at the employee's basic hourly rate for time lost from scheduled work will be paid by the Company.

c.      If an employee is at work when the death occurs, then the Company will pay up to four (4) hours at straight time for time lost due to leaving work early.

d.      The maximum number of hours payable by the Company for funeral leave will be a maximum of eight (8) hours per day at the employee's basic rate with no premium pay whatsoever for an overall maximum of twenty-eight hours.

e.      To be eligible for funeral leave pay as outlined above, the following conditions must be met:

15

1.   No allowance will be given unless the employee gives the Company notice, both of his or her intended absence from scheduled work and the time and date the employee intends to return to work.

2.   Promptly upon returning to work, the employee must apply for the allowance on a form provided by the Company. Proof of relationship to the deceased may be required.

3.   No funeral allowance will be paid for a contract holiday.

4.   No funeral allowance will be paid if the employee does not attend a funeral service; and

5.   The allowance will be paid only for scheduled work time lost and will not be counted in computing overtime.

6.   If an employee has scheduled PTO and a death in the family occurs, the employee will be allowed to take his or her funeral leave allotment and reschedule the PTO to a time approved by the Company.

## ARTICLE IX    JURY LEAVE

When an employee with thirty (30) calendar days or more plant seniority is required to perform jury duty, the employee will be given a daily supplement for each day on which he/she received jury pay of the difference between his or her jury pay and eight (8) hours times his or her base hourly rate up to a maximum of twenty (20) days in any two (2) year period. The supplement will be given under the following conditions:

1.   The employee must give the Company reasonable prior notice of his or her intended absence from scheduled work and the time and date the employee intends to return to work.

2.   Upon the employee's return to work, the employee must apply for the supplement on the form provided by the Company. The employee may be required to furnish proof of jury duty.

3.   The supplement will not be given for a recognized holiday; and

4.   The supplement will be given only for scheduled work time lost.

## ARTICLE X    CONTINUITY OF OPERATIONS

a.   While this Agreement is in effect, on the part of the Union, there shall be no

16

interruption, slowdown, stoppage, strike, or cessation of work.  On the part of the Company, there shall be no lockout.

    b.    In the event of an interruption, slowdown, stoppage, strike or cessation of work, the Company will notify the International and Local Unions and will not hold them liable for such action provided:

    1.    Within twenty-four (24) hours of time of notification, the International and Local Unions disavow responsibility for the action and order their members to return to work; and

    2.    The International and Local Unions in the utmost good faith use their best efforts to terminate such action; and

    3.    Authorized representatives of the respective International and Local Unions submit to the Company notices which state that the action is unauthorized and which order their members to return to work.  The Company may then post or distribute these notices.

    c.    The Company may impose any disciplinary action it deems appropriate, including discharge, on any employee participating in, supporting or encouraging such action. The Company's action shall not be subject to the grievance or arbitration procedures.  However, the issue of whether or not an employee participated in, supported or encouraged such action, is subject to the grievance and arbitration procedures.

## ARTICLE XI        LEAVES OF ABSENCE

**Section 1**    **General**

    Requests for leaves of absence must be submitted in writing sixty (60) days before the date desired.  The Company will allow or deny the request within fourteen (14) days of receipt of same.  If the Union feels the denial is unreasonable, it will sit down with the Company to discuss same.  Extension of leaves of absence must be requested before the expiration of the original leave of absence.

    Employees out of work as a result of sickness or accident shall have a right of reinstatement for a period of nine (9) months provided they have one (1) year of service. Employees out of work as a result of an industrial accident shall have a right of reinstatement for a period of one (1) year provided they have one (1) year of service.

**Section 2      Military Duty**

Employees who enter the Armed Services of the United States shall be entitled to all benefits specified by law upon their return to work following such service.

**ARTICLE XII          ADJUSTMENT OF GRIEVANCES**

a.      If an employee is called into the office by supervision, the employee may at that time ask for a steward to represent him/her.  When the steward arrives at the office, he/she may, at that time, ask for time to sit with the employee to discuss the matter prior to meeting with supervision.

b.      If an employee feels aggrieved, an earnest effort will be made to settle the employee's grievance immediately following in order the steps outlined below, but nothing in this Article shall be construed as prohibiting the employee from informally arriving at a settlement of such grievance with his or her Foreperson.

| | |
|---|---|
| **FIRST STEP:** | The aggrieved employee shall notify his or her Foreperson within three (3) working days after the employee reasonably could have had knowledge of the event on which the grievance is based.  The Company shall schedule a meeting within five (5) working days upon receipt of the grievance.  The Foreperson shall reply within three (3) working days after meeting with the employee and, if the employee so desires, the employee's Union steward.  In any event, there should be an oral discussion between the parties. |
| **SECOND STEP:** | If the Union wishes to proceed, the Human Resources Manager shall be notified within five (5) working days after the Foreman's reply.  The Company will schedule a meeting within five (5) working days upon receipt of the grievance.  The Human Resources Manager shall reply within five (5) working days after meeting with the Union Committee. |
| **THIRD STEP:** | If the Union wishes to proceed, the General Manager shall be notified within five (5) working days after his or her reply in the Second Step.  The President of the International Union and the President of the Company, or their representatives, shall meet.  If |

13

they are unable to agree, the matter may be carried to arbitration as provided in Article XIII.

c.       A grievance submitted by the Union regarding the discharge of an employee will be started at the third step of the aforementioned procedure.

d.       Any discharge case not protested in writing by the Union within five (5) days of its occurrence, shall be deemed waived.

e.       Waiver of the various time limits set forth above shall not constitute a precedent.

**ARTICLE XIII        ARBITRATION**

a.       In the event that a grievance is not settled by the procedure established in Article XII and the Union by written notice to the Company given within fifteen (15) calendar days of the answer in the third step request arbitration, or in the event that the Company has a grievance against the Union, the matter shall be referred to an arbitrator mutually selected from a list supplied by the American Arbitration Association.

b.       The hearing shall be held as soon as practicable and the decision rendered as soon after the hearing as possible.   Such decision shall be final and binding on the Company, the Union and the employees.  The arbitrator shall have no power to add to, subtract from, or modify any of the provisions of this Agreement.

c.       All expenses incidental to the services of the arbitrator shall be borne equally by the Company and the Union.

**ARTICLE XIV        PENSION**

a.       On February 1, 1999, Rand-Whitney instituted a new Rand-Whitney Pension Plan.

b.       Effective February 1, 2015, the benefit level will increase to thirty dollars ($30.00) per month per credited year of service with Rand-Whitney earned after February 1, 2015 (future service only).

c.       Effective February 1, 2017, the benefit level will increase to thirty-one dollars ($31.00) per month per credited year of service with Rand-Whitney earned after February 1, 2017 (future service only).

d.       Credit will be given for employment service with the prior Company for vesting purposes only in the Rand-Whitney Container LLC, pension plan.

e.      The full details of the pension plan are outlined in the pension plan distributed to all employees.

**ARTICLE XV**                    **GENERAL**

**Section 1**       **Bulletin Boards**

Bulletins relating to Union activities may be posted on the bulletin board provided by the Company.  The Company reserves the right of approval for material to be posted.

**Section 2**       **Non Discrimination**

a.      The Employer and the Union have a fundamental policy to provide equal opportunity to all qualified individuals in its recruitment and hiring practices, and to assure that there shall be absolutely no discrimination against any employee on the grounds of race, color, religion, national origin, ancestry, sex, age or disability.  It is also the policy of the Company to provide equal opportunity to all qualified disabled veterans and veterans of the Vietnam era without discrimination as provided in the regulations issued by the Department of Labor under the Vietnam Era Veteran's Readjustment Act of 1974.

b.      Whenever the masculine pronoun is used in this Agreement, the parties agree that it shall include and refer to the feminine pronoun, e.g., he/she, where appropriate to carry out the intention of the above paragraph.

**Section 3**       **Insurance**

Insurance benefits shall be those agreed to by the Company and the Union shown in Exhibit B.

**Section 4**       **Job Progression**

Lines of job progression are shown in Exhibit C.

**Section 5**       **Discharge and Termination**

The Company will notify the Union in writing when an employee is discharged and will also notify the Union of all other terminations.  However, prior to termination, an employee will be suspended pending termination for a maximum of ten (10) days to give the parties time to investigate.

20

**Section 6        Disciplinary Offenses**

   If an employee has no disciplinary offenses for a period of 365 calendar days, his/her oldest offenses shall not be used when administering future progressive discipline and the employee shall drop back one (1) step in the progressive disciplinary process.  This procedure will be used for each successive 365 calendar day period during which an employee has no disciplinary offenses.

**Section 7        Supervisors**

  a. Supervisors will not replace Bargaining Unit employees in performing work customarily done by Bargaining Unit employees, except as required for training, instruction, experimental work, or an emergency when such action is necessary for the continuity of plant operation.

  b. An employee who is promoted to a permanent job outside the Bargaining Unit shall retain his or her seniority and status within the Bargaining Unit for a period of ninety (90) days.

**Section 8        Seniority List**

   The Company will provide to the Local Union Committee an updated seniority list on a quarterly basis.

**Section 9        401(K) Plan**

   The Company has established a 401(k) plan, which shall be funded solely by employee contributions.

**Section 10        Accident Reports**

   The Company will provide the Union with all accident reports whether recordable or not.  Such reports will not include any medical records.

**Section 11        Cafeteria 125 Plan**

   The Company has instituted a Section 125 Cafeteria Plan effective January 1, 2005 to enable employees to set aside pre-tax money for medical and/or dependent care expenses.

**Section 12**     **Summer Help**

     a.     The Company can hire up to six (6) summer help at $11.00 per hour between May 1st and September 15th.

     b.     Summer help is not eligible for overtime unless all other employees refuse.

     c.     Summer help shall not serve as an Operator.

     d.     Summer help will not receive any benefit of an economic nature except for holiday pay if they meet eligibility requirements of Article IV.

**Section 13**     **Fulfillment Operation**

     a.     The Company may establish a fulfillment operation for work outside the traditional manufacturing process.

     b.     Such work would be presented to the fulfillment center for process after it has been produced through the plant. The inconsistent demand associated with this type of work requires a flexible workforce. Therefore, the company intends to use a temporary workforce to do the following:

         1.     "Hand-finishing" (stapling, hand gluing, assembly and collation) of components associates with corrugated displays.

         2.     Assembly and collection of corrugated components not associates with current equipment capabilities (set up and assembly of a tray and insert into a single unit for shipment).

     c.     The work would be restricted to a designated area in the plant and temporary workers would not be used to fill in for union employees under any circumstances.

     d.     Temporary workers used may be leased employees.

     e.     The fulfillment operation shall not operate on a forty (40) hour week or fifty-two (52) weeks per year.

**ARTICLE XVI**          **SEPARABILITY**

     a.     Nothing in this Agreement shall require the Company to do anything which is contrary to or inconsistent with any present or future Federal or State legislation, order, rule, regulation, directive or decision.

b.      The invalidity or unenforceability of any term or provision of this Agreement by reason of any present or future Federal or State legislation, order, rule, regulation, directive or decision shall not effect the remaining provisions of this Agreement.

## ARTICLE XVII        COMPLETENESS OF AGREEMENT

This Agreement constitutes all the agreements between the parties concerning wages, hours and conditions of employment in effect at the time of its signing; all previous agreements, including those agreements commonly referred to as "Side Agreement" not incorporated in this Agreement are null and void.  Rand-Whitney Container LLC assumes no past practices of the predecessor Company.

## ARTICLE XVIII       TERM OF AGREEMENT

a.      This Agreement shall be in effect from February 1, 2015 until February 1, 2018.

b       This Agreement shall be binding upon the successors and assigns of the parties

c.      If any party desires to terminate this agreement or to change any provision thereof, it shall give written notice of such desire to the other party at least sixty (60) days prior to the expiration date.

d.      The giving of such notice as provided above shall obligate both parties to arrange conferences and negotiate all questions at issue in good faith.

e.      This Agreement was ratified by Local Union 4-0902 of the United Steelworkers.

**AGREED TO AND EXECUTED AS OF** _____, 2015.

**United Steelworkers**
**AFL-CIO-CLC**

_____
Leo W. Gerard,
**International President**

**Rand-Whitney Container LLC**

_____
Geoffrey Schiffenhaus
**General Manager**

_____
Stanley Johnson
**International Secretary-Treasurer**

_____
Marisol Jimenez
**Human Resources Manager**

Thomas Conway
**International Vice President-Administration**

**International Vice President-Human Affairs**

**Director - District 4, USWA**

George J. Magnan
**Staff (Business) Representative**

**LOCAL UNION 4-0902**

Randall Mahoney
**President Local 4-0902**

**Financial Secretary**

Claude Nieman
**Treasurer**

Mark Tousey
**Chief Steward**

**Recording Secretary**

EXHIBIT A
RATE SCHEDULE
RAND-WHITNEY CONTAINER
NEWTOWN, CONNECTICUT PLANT

| Converting Department: | 02/01/2015 | 02/01/2016 | 02/01/2017 |
|---|---|---|---|
| Operator | | | |
| Starting and/or Transfer Rate | $21.92 | $22.47 | $23.03 |
| Final Rate after 6 months | $23.06 | $23.64 | $24.23 |
| 1st Helper | | | |
| Starting and/or Transfer Rate | $20.48 | $21.00 | $21.52 |
| Final Rate after 6 months | $20.79 | $21.31 | $21.84 |
| Floater | | | |
| Starting and/or Transfer Rate | $19.63 | $20.12 | $20.62 |
| Final Rate after 6 months | $20.18 | $20.69 | $21.20 |
| Strapper Operator | | | |
| Starting and/or Transfer Rate | $17.23 | $17.66 | $18.10 |
| Final Rate after 6 months | $19.08 | $19.55 | $20.04 |
| Department Helper A | $17.97 | $18.42 | $18.88 |
| (Grandfathered rate for current EE's only) | | | |
| Department Helper B | $15.00 | $15.00 | $15.00 |
| (New Hires after 2/1/2015) | | | |
| New Hires | $15.00 | $15.00 | $15.00 |
| Die Room Person* | | | |
| Starting and/or Transfer Rate | $21.18 | $21.71 | $22.25 |
| Final Rate after 6 months | $22.17 | $22.73 | $23.29 |
| Shipping Department: | | | |
| Checker Loader | | | |
| Starting and/or Transfer Rate | $21.24 | $21.77 | $22.31 |
| Final Rate after 6 months | $21.36 | $21.90 | $22.44 |
| Power Truck Operator | | | |
| Starting and/or Transfer Rate | $20.10 | $20.60 | $21.11 |
| Final Rate after 6 months | $21.12 | $21.64 | $22.18 |
| Maintenance Department: | | | |
| Electrician | | | |
| Starting and/or Transfer Rate | $30.18 | $30.93 | $31.70 |
| Final Rate after 6 months | $30.99 | $31.76 | $32.55 |

25

| Master Mechanic | | | |
| --- | --- | --- | --- |
| Starting and/or Transfer Rate | $27.32 | $28.00 | $28.70 |
| Final Rate after 6 months | $29.37 | $30.10 | $30.85 |
| | | | |
| Maintenance Class C | | | |
| Starting and/or Transfer Rate | $20.33 | $20.83 | $21.35 |
| Final Rate after 6 months | $21.35 | $21.88 | $22.43 |

*Die Room Person - bidding by seniority in the
Converting Department

Shift Differential will be paid only to those employees assigned to the 2nd and 3rd shifts. Shift differential will be included in holiday pay to those employees assigned to the 2nd and 3rd shifts.

## EXHIBIT "B"
## INSURANCE

**Section 1     Health Insurance**

- Effective the first month following ratification, all employees will contribute 33% of the monthly health insurance premium.

- In 2015, the Company will keep the current No-Deductible plan options that it offered in 2014. The premiums will remain the same in 2015 as they were in 2014 with the employees responsible for 33% of said premium. The premiums are $661.98/individual and $1,725.77/family for the No-Deductible option.

- In 2016 the Company will no longer offer the No-Deductible Plan.

- In 2016 the Company may offer the Access America High Deductible (or comparable plan). Employees who choose this plan will be responsible for 33% of these premiums in 2015, 35% of the 2016 premium and 35% of the 2017 premium.

- In 2016 and 2017, along with the Access America High Deductible plan (or comparable plan), the Company may offer one additional health insurance plan of its choosing, consistent with what it is offering to other Company employees. Employees who choose this additional plan, should it be offered, will be responsible for 33% of these premiums in 2015, 35% of the 2016 premium and 35% of the 2017 premium.

- Beginning in the year that the Access America (or comparable high deductible plan) is offered, the Company will contribute $500/individual and $1000/family into each employee's Health Savings Account, provided the employee is enrolled in the high deductible option and has set up an HSA account. If this plan is available and selected by an employee in 2016, the HSA account must be set up in accordance with Plan requirements for the employee to receive the upfront contribution, which will be paid on the first payroll following enrollment in an HSA. If selected by the employee in 2016, the employee will receive the upfront payment on the first payroll following January 1,

2016.

- ○ Employees enrolled in the Access America (or comparable high deductible plan) will receive the above contributions into their HSA each year of the contract. However, the payment will only be made upfront in the first year he/she enrolls in the plan. For each subsequent year, the employee will have the contribution made on his/her behalf, consistent with Company policy (which is currently to divide it up equally over the 26 pay periods).

- ○ The Company reserves the right to change health insurance providers provided comparable coverage is offered.

- ○ The Company, through its Human Resources or Benefits Department, will provide an employee with the current plan design description.

**Section 2    Sickness and Accident Insurance**

      The sickness and accident benefit will be as follows:

As of February 1, 2015 - Per Week .................................................................................$335.00

      Benefits will be paid from the first day of an accident and the third day of an illness for twenty-six (26) weeks.

**Section 3    Life Insurance**

      As of February 1, 2015, the Company will provide a life insurance policy in the amount of $29,000 Life and $29,000 Accidental Death and Dismemberment.

**EXHIBIT C**

**LINES OF PROGRESSION**

## Converting Department

Operator
1st Helper
Floater
Strapper
Department Helper A
Department Helper B
New Hires

## Shipping Department

Checker Loader
Power Truck Operator

27

**Maintenance Department**

Electrician
Master Mechanic
Maintenance Class C

*Die Room -- Bidding by seniority in the Converting Department

## EXHIBIT D

### LINES OF PROGRESSION GUIDELINES FOR THE MAINTENANCE DEPARTMENT

**Maintenance Class C:**
General skill requirements:
   a.   Maintain parts and material inventory utilizing maintenance computer software, and be able to find and identify maintenance parts.
   b.   Should be able to contact and communicate with suppliers.  Assure delivery of materials as needed.
   c.   Purchase necessary parts and supplies at most competitive prices and the highest quality.
   d.   Responsible for snow removal.
   e.   Capable of operating and maintaining the Beckart System.
   f.   Assists with maintenance general help duties including painting, cleaning, basic carpentry, plumbing and machinery repair.
   g.   Must be ready to assist on maintenance projects, breakdowns and rebuilds as needed.
   h.   Must be available for emergency call-in.
   i.   Must have a valid driver's license.
   j.   Must have general working knowledge of all plant and regulatory safety codes.
   k.   General knowledge of maintenance department equipment and procedures.
   l.   Any other duties the Maintenance Supervisor deems necessary.

**Master Mechanic:**
General skill requirements:
   a.   General knowledge of maintenance department equipment and procedures.
   b.   Basic welding skills.
   c.   Basic troubleshooting skills.
   d.   Basic electrical repairs.
   e.   Basic hydraulic repairs.
   f.   Basic pneumatic repairs.
   g.   Basic lubrication procedures.
   h.   Basic diagram and manual reference skills.
   i.   Ability to perform more complicated repairs under supervision.
   j.   Must have general working knowledge of all plant and regulatory safety codes.
   k.   Ability to assist in al Preventative Maintenance tasks.

l.   General knowledge of all plant machinery.

m.   Score of at least 70% on TAPPI maintenance I qualification exam.

n.   Must be capable of rebuilding equipment to OEM specifications with no supervision.

o.   Must be capable of installing equipment by utilizing engineering drawings.  This is to include all utilities and peripheral services.

p.   Must be capable of diagnosing and solving mechanical and electrical malfunctions with no supervision.

q.   Must be capable of instructing others and aiding in their learning experience on both mechanical and electrical applications.

**Electrician:**

General skill requirements:

a.   Must possess a minimum of 8000 hours of electrical experience

b.   Must have achieved the minimum of 2000 hours of technical training or the equivalent of a journeyman status by the state electrical standards.

c.   Must be proficient in all aspects of electrical voltage, distribution, code interpretation and application.

d.   Must have the ability to work without supervision and to train mechanics of all levels in safe electrical work practices.

## EXHIBIT E
## SUPPLEMENTAL MEMORANDUM OF AGREEMENT

1.   Job responsibility guidelines for all intent and purposes are an expressed part of this Agreement.

2.   One person feed to be limited to twelve and a half square feet.

3.   Temporary Supervisors - If an employee is assigned temporarily to a supervisor position for less than ninety (90) accumulated days, said employee will retain former job seniority rights.  If the assignment is in excess of ninety (90) accumulated days, said employee will revert to the work force without seniority of status. (Per Annum)

4.   When the current part time waste water treatment person retires, the duties of the job will be performed by the Maintenance Department employees qualified to perform the work.

**Safety Shoes**

5.   As of February 1, 2015, the Company will give each employee with at least six (6) months of service up to one hundred thirty-five ($135.00) dollars for safety shoes upon proof of purchase by providing one submission for each year of the contract.

New employees will be given one hundred thirty-five ($135.00) dollars upon completion of six (6) months of service and upon providing proof of purchase by providing a receipt.

6.  A local union official will be a member of the Safety Committee.  Union officials will be assigned on a rotating basis.

## SAFETY RULES AND PROCEDURE

1.  Report all incidents (injuries and property damage) no matter how slight, to your supervisor immediately before going to First Aid.  Failure to do so may result in disciplinary action.

2.  Wear safety equipment, such as goggles, gloves, helmets, etc. if your job requires the use of such equipment.  Safety shoes are mandatory plant-wide.  Hearing protection must be worn in designated areas.  Long, loose hair can be caught in a machine or be attracted by static electricity.  Headbands, hairnets or other restraining devises must be used.  Your supervisor will tell you how to get such equipment.

3.  Observe and obey all danger signs and warnings.

4.  Do not wear loose fitting or torn clothing, finger rings or loose jewelry while working around or on machinery.

5.  Do not pass under raised stackers, pre-feeders, material handling trucks or materials at any time unless properly secured.

6.  Do not, under any circumstances, pass over, under or sit between railroad cars or tractor trailer trucks (except drivers).

7.  Horseplay is not allowed in the plant.

8.  Do not use an air hose to clean your clothing or blow compressed air on a fellow employee.

9.  Eye Protection - Your eyes are one of your most valuable possessions. We cannot at any cost replace an eye if you should lose it on the job.  Therefore, all employees, office personnel and visitors will be required to wear approved eye protection in all manufacturing areas of the plant.  Safety glasses will be available from the supervisors (see Eye Protection Policy for further details).  Goggles must be worn when performing the following jobs:

    A.  Grinding
    B.  Overhead Scraping
    C.  Chipping Ink or Glue
    D.  Welding or Cutting (Operator and Helper)
    E.  Operating Electric Drills, Drill Presses, Sander and Electric Saws
    F.  Handling Hazardous Chemicals
    G.  Cleaning With Compressed Air or Steam

10.  It is also recommended that goggles be worn while doing the following jobs:

30

A.     Regularly Scheduled Machine Clean ups (Entire Crew)

11.   Report to your supervisor any machinery, tools, equipment or conditions which appear to you to be unsafe, including broken or missing guards.

12.   Do not, under any circumstances operate a power truck or any other machinery unless you are authorized to do so by your supervisor.

13.   ONLY AUTHORIZED PERSONNEL MAY OPERATE ELECTRICALLY DRIVEN EQUIPMENT.  SPECIAL SAFETY RULES APPLY.

14.   NEWTOWN'S LOCKOUT/TAG OUT/TRY PROGRAM MUST BE FOLLOWED AT ALL TIMES.

15.   OBSERVE PLANT SMOKING AND FIRE REGULATIONS.

16.   BEFORE WORKING ON STEAM, AIR, WATER OR ELECTRICAL LINES, CONSULT YOUR SUPERVISOR.  SPECIAL SAFETY RULES APPLY.

17.   CROSS CONVEYORS ONLY AT DESIGNATED POINTS.  DO NOT WALK ON CONVEYOR ROLLERS.

18.   When cleaning any machine, be sure that it is shut down and all safety features are set. Use extra precautions when working near nip points.  Safety rules cannot cover all the ways in which you might get hurt.

19.   Gloves - Company issued knives are the only approved knives to be used in the plant and used in conjunction with a safety glove on both hands.

20.   Do not block fire protection equipment or doors.

21.   If you are taking prescription drugs that may affect your work in any way, report this to your supervisor.

22.   Do not climb or walk on stacked materials.

23.   Never leave a running machine unattended.  All equipment and tools must be properly stored when not in use.

24.   Never put your hand into a machine that is running.

25.   Only assigned maintenance personnel are allowed to make repairs on electrical equipment.

26.   Do not climb or walk through machinery as a shortcut.

27.   Ladders and scaffolds must be made secure and safe before using.

28. All employees will be responsible for maintaining good housekeeping in their work areas.
29. Hazardous chemicals will be stored in well marked containers.
30. Employees handling or transporting cutting dies are required to wear special protective gloves.

## PLANT VEHICLES - (FORK TRUCKS)

1. Vehicles in the plant shall be driven by authorized and qualified drivers only.

2. No riders are permitted on vehicles not specifically equipped for riders. Do not ride on forks or lift trucks.

3. Stunt driving and horseplay are prohibited.

4. When lift trucks are traveling, they should travel backwards except when picking up or stacking loads, when empty and gate is fully extended with blades or bucket low, when loads are not impairing drivers' visibility.

5. Blow horn before entering aisles, doorways, or corners.

6. Drive at a safe speed at all times.

7. Established traffic regulations shall be observed at all times.

8. Do not exceed lift truck load limits

9. Do not allow anyone near any part of truck or load when truck is in use.

10. Drivers are responsible for cleaning up oil and water spills. Clean up as soon as possible.

11. Do not stack loads that do not have proper bottom and binding sheets or that cannot be taken down safely.

12. Do not stack loads more than three high.

13. Do not stack loads more than one high on corners or two high by aisles and machines.

14. All loads must be level before stacking.

15. Lift trucks will not be left running while unattended.

16. Vehicles will maintain a safe distance from other vehicles and be kept under positive control at all times.

17. Any spilled loads will be picked up immediately.

18. Do not change anything on lift trucks that govern speed.

19. Before leaving their vehicle, drivers must:

- Park in designated area or park sheets
- Lower load to the ground
- Place controls in neutral or park
- Set parking brake
- Shut off power or key

20. Review PM checklist for the lift truck at the start of the shift.  Vehicles found unsafe should be taken out of service until repaired.

21. Seat belts must be worn when operating a fork truck.

22. All trucks must stop at all intersections.

## EYE PROTECTION POLICY

I. **PURPOSE**

The purpose of this Eye protection Policy is to assure that proper personal protective equipment is used by all plant personnel, and all plant visitors while on the manufacturing floor.  By following this policy, the potential for eye injury due to dust, particulate matter and liquids will be reduced.

II. **SCOPE**

A. This policy is applicable to all persons regardless of professional affiliation.

B. This policy is applicable while on the manufacturing floor.

C. It is the responsibility of each supervisor to assure that employees observe this policy.

D. It is the responsibility of whoever a visitor is seeing to assure this policy is observed.

III. **POLICY**

A. All persons will be required to wear safety glasses while on the manufacturing floor.

B. Plant employees will be provided appropriate safety glasses during their employment.

33

**Non-Prescription Glasses:** Glasses will be issued through your supervisor. Employees will be issued glasses on an as needed basis and required to sign notice of their issue. If replacement glasses are needed due to damage, an exchange will be required. If replacement glasses are due to loss, one additional pair per year will be provided. Employees will be charged for any additional pairs.

**Prescription Glasses:** Rand-Whitney Container LLC has secured the services of an outside supplier to provide prescription eyeglasses for employees.

The Company will provide employees with up to $120 per plan to be used for the purchase of prescription safety glasses upon providing proof of purchase by providing a receipt.

The employee is responsible for the following:

1.     New eyeglass prescription
2.     Any charges in excess of the above

If an employee has a prescription change, Rand-Whitney Container LLC will provide new lenses, limited to one change per plan year February 1 to February 1.

If an employee damages glasses at work, Rand-Whitney Container LLC will provide one replacement pair per year. Exchange will be required. Replacement and/or exchange will not take place if due to neglect. Employees will be responsible for all other replacement charges.

If an employee loses glasses he/she will be responsible for entire cost of replacement.

C.     All new hires are required to purchase prescription safety glasses as described above. After completing the 120 days probationary period, the amount of the prescription glasses will be reimbursed as described above.

D.     If an employee comes to work without safety glasses, he/she will be issued a pair of visitor glasses to complete his/her shift. If any employee prefers to retrieve his/her own glasses, he/she will be charged with an occurrence as described in the Attendance Policy.

IV.   **DEFINITIONS**

A.     Manufacturing floor: Everything except front offices, locker room and cafeteria.

B.     Safety Glasses: Glasses meeting ANSI standards for industrial environment.

## PLANT RULES

1. **Reporting for Duty**

   A. Each employee must be at his/her station, ready for work, at the scheduled starting time of his/her shift and must remain there until the scheduled quitting time, or until properly relieved, which may include overtime.

   B. Each employee must remain at his/her station during his/her shift and not visit other parts of the plant except in the line of duty or by permission of his/her supervisor.

2. **Attendance Policy and Guide**

Effective January 1, 2015, the Kraft Group & Affiliates (hereinafter the "Company") will adopt the following attendance policy for all non-exempt personnel. The objective of this policy is to clearly define on-time and regular attendance to an employee's scheduled shifts. It is critical to the organization's success that all employees understand the importance of timely, regular attendance to improve productivity, safety and morale. Additionally, this policy will outline the consequences of chronic tardiness or attendance issues.

We will define occasional absences as follows:

Absence from Work, 1 point: When an employee is absent from work for his/her scheduled shift regardless of the reason, but excluding any approved state, federal, or company leave of absence or any worker's compensation absence. An approved paid or unpaid day off will not be considered an absence to an employee's schedule. All time off requests must be submitted in writing 2 weeks in advance, or as soon as practicable, for approval by the manager. Requests submitted on or after the requested day off will result in 1 point and must be recorded as unexcused. Any consecutive day absences, substantiated by appropriate medical documentation, will be treated as one occurrence (point).

Lateness/Tardiness, .5 points: Where an employee punches in for their scheduled shift after the start time, including scheduled overtime. If an employee arrives to work more than 3 hours after the start of their scheduled shift, the manager may determine whether the employee may work or not.

Job Abandonment, 7 points*: When an employee (1) leaves work prior to the end of their scheduled shift, including scheduled overtime, or they leave work and return without obtaining prior approval from their supervisor, (2) When an employee is absent from work without notification or notification is provided more than three hours after the start of their shift. *multiple days of absence without appropriate notification may result in immediate termination.

Punching Violations: When an employee fails to punch in or out for their scheduled shift or meal, when applicable. Failure to punch in applies in situations where it is known that the employee is at work. It is the responsibility of the employee to notify their supervisor

35

immediately if they cannot punch in or out. Disciplinary action will apply. If it is believed that an employee has deliberately failed to punch to avoid points they will be disciplined up to and including termination.

Each pay period, the company will review the prior 12 month rolling attendance report from the timekeeping system for chronic absences and/or tardiness that will result in disciplinary action as follows:

1. Written Warning: 6 points of absence or tardiness in the prior 12 rolling month period. You will not be able to combine absences and tardiness to achieve the initial 6 points for disciplinary action.
2. Final Written Warning: 7 points of absence or tardiness in the prior 12 rolling month period. Job Abandonment, as defined above, will result in a final written warning and seven points.
3. Termination: 8 points of absence or tardiness in the prior 12 rolling month period.

Each Counseling will be delivered by a supervisor as soon as possible following the pay period reporting. An employee will be provided a copy of the written counseling. All disciplinary action will be included in the employee's personnel record.

    A.    **PERFECT ATTENDANCE** will be rewarded in two (2) ways:

        1.    For each full calendar quarter an employee does not have any Points, that employee will be awarded ten (10) hours of straight time which will be paid at the end of the year.

                Since it is the intention of this provision to only reward **PERFECT ATTENDANCE**, the occurrence of any incident including credit days, five (5) minutes late, lateness or punch violations, will eliminate the employee from this reward during the month of the occurrence.

        2.    When an employee has a full year of **PERFECT ATTENDANCE** there will be $300.00 payroll check awarded to such an employee.

    B.    In the event of adverse weather resulting in the declaration of a "National Weather Emergency for Connecticut" by the National Weather Service, no attendance penalties will apply to employees who elect not to come to work for an affected shift or leave early in anticipation of difficult driving conditions. The employee is still responsible for notifying the foreman in either case. The Rand-Whitney weather line telephone number is (203) 270-4088.

    C.    The Company will provide the Union with weekly reports on employee's attendance points. Employees will receive discipline pursuant to the Attendance Policy in a reasonable period of time.

    D.    Employees who are scheduled to report for work before their normal shift starting time shall be given the same consideration for attendance point avoidance for weather and/or traffic reasons that employees are given who report at their regularly scheduled start up times.

3.    **Time Cards**

    A.    Each employee must enter their Personal Clock ID# at the beginning and ending of their shift, or any other time they leave the plant premises, such as lunch time.

    B.    No employee shall enter the Personal Clock ID# of another employee under any circumstances.

    C.    An employee must not enter their Personal Clock ID# more than (1) minute before their shift and must not enter their Personal Clock ID# more than one (1) minute after the end of their shift.

4.    **Paychecks**

Employees will be paid on a bi-weekly payroll. Pay days will be on Fridays unless not available in a holiday week or circumstances beyond the Company's control.

5.    **Change in Shifts**

Employees may not exchange shifts except with the prior approval of both supervisors.

6.    **Address-Family Status**

    A.    Many times there is a critical need to have information about an employee and/or his/her family. Therefore, if an employee changes his/her address or telephone number, he/she must report the change immediately in the Employee Self Service.

    B.    If an employee's marital status or number of dependents change, he/she must report the change immediately to the Employee Self Service.

## RULES OF CONDUCT

**PROGRESSIVE COUNSELING**

It is the Company's intention to counsel those employees not performing at an acceptable level in an effort to improve performance. In many cases, the Company may offer to address an employee's sub-standard performance through a number of documented meetings and agreed upon methods of improvement with a member of management. However, in some instances,

counseling may not be possible or practical or the issues may be so serious that more immediate action may be called for, up to and including immediate termination. The Company specifically reserves the right to modify the steps of its progressive counseling process, including the progression to termination.

**Causes for Disciplinary Action**

Violation of Company rules may result in disciplinary action being taken. Repeated or severe violations will result in termination at management's discretion. The following list provides some grounds for discipline or termination of an employee. It is important for you to be aware of the seriousness with which the Company regards these offenses. This list is not exclusive and is subject to change with or without notice.

1.  Failure to meet job requirements.

2.  Repeated errors and/or violations of Company policy and procedures.

3.  Failure to comply with Personal Information / Data Security policy and company equipment utilization policy.

4.  Leaving or entering from an unauthorized entrance/exit.

5.  Misuse of security credentials, including lending credentials or failing to report lost/stolen cards.

6.  Leaving work without authorization, including abuse of meal and break periods.

7.  Excessive tardiness/absenteeism.

8.  Failure to notify your supervisor of your inability to report to work at your scheduled time.

9.  Possession or use of drugs, or other illegal substances in the facility. Possession or use of alcohol during scheduled working hours or reporting to work in a condition considered by a supervisor to be unfit for duty.

10.  Smoking in unauthorized areas.

11.  Buying or selling lottery, sweepstakes, or number pool tickets or any gambling activities during business hours.

12.  Quarreling or inappropriate language or behavior.

13.  Unauthorized solicitation on company premises.

14.  Unauthorized divulgence of company records or personnel records.

15.  Dress code violations.

16.  Being involved in or taking any action that could harm the Company's reputation or standing in the community.

17.  Actions by an employee that cause accidents as a result of carelessness and/or lack of concern for safety.

18.     Any other action that the company deems inappropriate or improper.

CAUSES FOR IMMEDIATE DISCHARGE

The actions listed below may result in immediate discharge. This list is not exclusive, and is subject to change with or without notice.

## VIOLATING ANY OF THE RULES BELOW WILL RESULT IN IMMEDIATE DISMISSAL

1.     **Stealing**

   Theft or embezzlement or acting as an accessory to embezzlement or to theft of property, assets, money belonging to coworkers, vendors or the Company or misuse of your employee discount and company provided parking passes.

2.     **Falsification of Company Documents**

   Any falsification of documents with or without personal gain, or being an accessory to such falsifications, including falsification or omission on employment application forms and time keeping violations (misrepresentation of hours worked).

3.     **Insubordination**

   Refusal or deliberate failure to follow instructions from a supervisor.

4.     **Safety Violations/Physical Violence**

   Willful actions by employees that result in injury to other employees, themselves or in damage to Company property; threat of physical violence; possession of firearms, ammunition or explosives on Company property.

5.     **Gross Negligence**

   Gross negligence in any aspect of your job or responsibilities.

6.     **Violation of Public Law**

   Violation of Public Law including but not limited to: discrimination, lewdness, sexual assault, domestic violence, child abuse, vandalism, illegal gambling, possession and/or offering for sale restricted drugs.

7.     **Conflict of Interest**

   Knowingly having a job or affiliation that is in direct conflict with the business of the Company and not disclosing this conflict to Human Resources. Accepting gifts beyond the defined terms in the Gift Policy from any customer, contractor, or others who are doing business with the Company without specific management approval.

8.     **Selling/Scalping Tickets**

Any resale, scalping, or trading for gain, of Patriots, Revolution or Event tickets is strictly forbidden.

9.  **Breach of Confidentiality**

Knowingly violating the terms of the Confidentiality and Non-disparagement provisions of this handbook with respect to Confidential Information or information that is otherwise proprietary, sensitive or unique except as necessitated by normal business operations.

# EXHIBIT C

Thursday, February 18, 2015        4:38 PM



**UNITED STEELWORKERS**

Randall Mahoney
605 High St
Naugatuck, CT 06770

Robert Kraft
1 Patriot Place
Foxborough, MA 02035-1374

Dear, Robert Kraft

    In reference to our previous contract at the Newtown Ct facility, I am writing in regards of vacation pay. We now earn vacation in the same year. In previous years when an employee was hired they had to earn vacation time for the next year. You were not given vacation until your one year anniversary. The second year and years after you need to work 1040 hours to earn your vacation for the next year.
    When we negotiated a new contract beginning in February 2015 that changed starting that year. All employees that worked 1040 hours or more the year 2014 earned their vacation for the year 2015. Since the vacation system changed all employees should have received a check for their vacation that they earned in 2014. This should have been paid by December 31, 2015. As of April 18, 2016 we have not received our vacation pay.
    I am notifying you so we can resolve this oversight without having to take further action.

                                        Thank you,
                                        Randall Mahoney

                                        President local 40902
                                        Newtown, CT

Please feel free to contact me at uswlocal40902@gmail.com or by above address.

# EXHIBIT D



**RAND-WHITNEY**

Certified Mail 7009 3410 0001 1630 7042

April 26, 2016

Randall Mahoney
President of Local Union 4-0902
605 High Street
Naugatuck, CT  06770

Re:    **Vacation Pay**

Dear Randy,

I am in receipt of your letter dated February 18, 2016 to Jonathan Kraft and I am responding on his behalf.

As you know, all disputes arising under the collective bargaining agreement are to be handled through the grievance and arbitration provision(s) set forth in Article XII and Article XIII.  Since you failed to submit a grievance on this issue as required by Article XII, the Company denies your grievance both on substantive and procedural grounds.

Sincerely,

Marisol Jimenez
HR Manager